Elmer J. BENES, Appellant,

v.

UNITED STATES of America, Appellee.

No. 13825.

United States Court of Appeals Sixth Circuit.

March 21, 1960.

Allen N. Corlett, Cleveland, Ohio, William A. Welty, of Roudebush, Adrion,

Brown, Corlett & Ulrich, Cleveland, Ohio, on brief, for appellant.

James C. Sennett, Jr., Asst. U. S. Atty., Cleveland, Ohio, Russell E. Ake, U. S. Atty., Cleveland, Ohio, on brief, for appellee.

Before SHACKELFORD MILLER, Jr., and WEICK, Circuit Judges, and WILLIAM E. MILLER, District Judge.

WILLIAM E. MILLER, District Judge.

Appellant was tried in the court below upon an indictment in three counts charging that he wilfully and knowingly attempted to evade and defeat a large part of the income taxes owing by himself and his wife for the calendar years 1947, 1948 and 1949. The jury returned a verdict of not guilty as to the first count and guilty as to each of counts II and III. The defendant was sentenced for a period of five years on each of counts II and III to run concurrently. This appeal followed.

In 1941 the appellant began the business of an industrial and commercial contractor in Cleveland, Ohio. In 1946 the business was incorporated under the laws of Ohio under the name of E. J. Benes & Company, Inc., appellant owning all but three of its 503 outstanding shares of common stock and completely dominating its affairs. The office staff of the corporation consisted of Benes, one or two estimators or salesmen, and Mrs. Mary C. Miranda, who at all times pertinent herein was the office secretary, stenographer, receptionist, bookkeeper, and filing and billing clerk.

The appellant and his family lived in a house on Hemlock Point Road near Chagrin Falls, Ohio, for approximately eleven years, but in 1947 he purchased 20 acres of picturesque, suburban, residential property fronting on County Line Road, Hunting Valley Village, Ohio, and had the record title to the land placed in the name of his wife, Frances M. Benes. The cost of the land was $14,-871.50 which was paid by means of funds of the corporation which were charged

on the corporate books as a debit against the appellant's personal loan account. Soon after the purchase of the land, the construction of an elaborate home was commenced on the property, and in December 1949 Benes and his family moved into the new residence although it was not finally completed until May 31, 1950. The evidence disclosed that the Hunting Valley residence was constructed altogether by the use of corporate funds at a total aggregate cost in excess of $170,000.00.

Under the bookkeeping system used by the corporation, each contract with a customer for a new construction project was assigned a number when received, and a new project ledger sheet bearing the same number was opened in the corporate books of account. Thereafter all costs and expenses incident to such project were identified on the corporate books by the name of the customer followed by the job reference number. It was the practice of the corporation to compute its annual gross income by taking the total billings of the corporation to its customers during the corporation's fiscal year June 1 to May 31, no account being taken of whether the billed accounts were paid within the fiscal year. The net taxable income of the corporation was determined by subtracting from the gross income the total of all the expenditures of the corporation paid in the fulfillment of its contracts with customers, i. e., the aggregate building construction costs for material and labor, office and sales expenses, administrative expenses and salaries, etc.

In connection with the County Line Road or Hunting Valley residence, the appellant directed his office secretary to set up a new corporation record file, which is referred to in the record as the "House File". No corporate reference number or numbered customer job ledger sheet was assigned for this particular project. All costs and expenses for material and labor that went into the construction of the Hunting Valley residence were recorded in the house file which the appellant kept in his desk apart from the other records of the corporation. He gave directions to his secretary to charge all of the costs of the material and labor for the house in Hunting Valley to other projects which the corporation had on its books at the time of construction. She was further directed, however, not to bill any of these charges for the Hunting Valley residence to the respective customers to whose accounts they were charged. In this manner the entire costs of the Hunting Valley residence, consisting of approximately 750 separate items, were carried in the separate house file and were also charged to some 17 separate customer accounts which the corporation had on its books at the time of construction. In accordance with the appellant's directions, no bills, however, were sent to any of the respective customers for the cost of the Hunting Valley project. The items of expense for the house were deducted in determining the profits of the corporation and hence resulted in decreasing, pro tanto, its taxable income.

In the middle of April 1951 the appellant took the corporate house file to his accountant, Martin F. McQuilkin, advised him that he had built a house and charged the costs to various jobs of the company, and asked him what he should do about it. McQuilkin decided that it was necessary to file amended income tax returns for the corporation and such returns were in fact filed on May 8, 1951, for the fiscal years ending May 31, 1947, 1948, 1949 and 1950. McQuilkin's method of accounting for the house was to carry back the aggregate cost of the Hunting Valley house and to treat it as a corporate profit for the respective fiscal years during which the house was under construction. This method increased the corporate profits for such fiscal years, and this in turn, of course, increased the taxable income of the corporation for each of these years a like amount. The adjustment resulted in a total additional income tax of $74,578.79. The entire tax was later paid by the corporation together with accrued interest upon the additional tax obligation computed from

the dates of the filing of the respective original tax returns.

As of May 31, 1951, McQuilkin prepared adjusted journal entries for the corporate books of account which were posted by the bookkeeper in the journal and then the corporate ledger. He also prepared a promissory note from Benes to the corporation which was pre-dated to June 1, 1950, in the amount of $177,178.97, which the appellant executed. A debit to "Notes Receivable" was entered with notation "To record amount of note receivable from E. J. Benes". A credit to surplus in the same amount was entered. The full amount of the note with interest was paid by the appellant to the corporation, with the result that he actually paid to the corporation the full amount of the cost of the Hunting Valley residence.

On May 1, 1951, Harold E. Sullivan, Internal Revenue Agent, who had been assigned to examine the return of the corporation for the fiscal year ending May 31, 1950, contacted the appellant at his office and questioned him as to the residence in Hunting Valley, and it was eight days later that the amended corporate returns were filed as above stated. Approximately three months after the amended corporate returns were filed, a special agent of the Internal Revenue Service, Ben Lewitt, began an investigation of the corporation records in connection with the amended returns. The agent was shown the house file pertaining to the Hunting Valley residence and other corporate records and books of account.

On September 12, 1955, the indictment against the appellant was returned by the grand jury, charging the appellant with wilfully attempting to evade and defeat income taxes owing by himself and wife for the years 1947, 1948 and 1949. The first count charged an understatement of income in the amount of $3,363.46 for the year 1947, resulting in an underpayment of tax in the amount of $1,192.99. The second count charged an understatement of income for the year 1948 in the amount of $75,358.22, resulting in an underpayment of income tax in the amount of $42,974.82. The third count charged an understatement of income for the calendar year 1949 in the amount of $91,400.59, resulting in an underpayment of income tax in the amount of $53,823.96. The understatement of income charged in the indictment corresponds with the amount which Internal Revenue Agent Lewitt computed from the corporation's house file as having been expended during the tax years in the construction of the Hunting Valley residence.

It was the theory of the Government in the trial of the case and is its theory and insistence here that the appellant intended from the beginning that the residence in Hunting Valley should be his; that to the extent of the cost of the residence the appellant and his wife realized an economic gain which should have been reported as income in their joint income tax returns for the tax years during which such cost was incurred or charged; that the effect of the transaction was that the appellant wrongfully diverted the funds of his wholly-owned corporation and applied them in such manner that he realized a personal gain therefrom which is taxable under the doctrine of Davis v. United States, 6 Cir., 226 F.2d 331, and cases of like import.

One ground upon which the appellant seeks to reverse the judgment of conviction is that the instructions of the District Court to the jury exceeded the bounds of fair comment and constituted prejudicial error. Since we are of the opinion that this insistence of the appellant must be sustained, and that the case must for that reason be reversed and remanded for a new trial, it will be discussed first.

A careful examination of the trial court's charge discloses that the general parts of the charge are unexceptionable and that he correctly and fully instructed the jury with respect to the necessary elements to constitute the offense charged in the indictment under Title 26 U.S. C.A. § 145(b), being an affirmative wilful attempt to defeat and evade income

taxes owing by himself and wife, and the existence of a tax liability in excess of that reported. The court also advised the jury that it was its exclusive function to determine the facts and that if the jury's recollection as to the facts differed from his, the jury should be guided by its own recollection and not by that of the court. The difficulty, however, is that the court in the course of its charge to the jury, made a number of misstatements of fact concerning important aspects of the evidence and in a very vital respect misstated and distorted the theory of the appellant in defense of the charge.

One such misstatement was with respect to the time when the Internal Revenue agent first contacted appellant. On this subject the court charged the jury:

"On this loan question you have a right to consider that long before McQuilkin figured out and consummated this loan transaction, Mr. Lewitt, who had seen the House File, asked Benes whether he was going to pay the corporation back, and Benes said 'That is a leading question'."

The undisputed evidence was that Benes did not talk with Lewitt and had no contact with him until August 2, 1951, three months after McQuilkin adjusted the corporate records to reflect the transaction as a loan. A similar misstatement of fact was made by the court in discussing the important question as to why Benes delivered the house file to McQuilkin in the middle of April 1951 and sought his advice as to what should be done with respect to the new house. It is obvious that if an agent of the Internal Revenue Service had contacted the appellant prior to that time, such fact would be relevant in determining the appellant's motive in voluntarily disclosing the contents of the house file to his accountant. But the court instructed the jury that "you may and should decide why Benes produced the House File and gave it to McQuilkin when he did in 1951. Mr. Sullivan had recently been to see him and been checking out his books."

The fact was, however, that Benes delivered the house file to McQuilkin in the middle of April 1951, and that the Internal Revenue Agent Sullivan did not talk to Benes or see any books of the corporation until May 1, 1951, some two weeks later.

■■ As held in Quercia v. United States, 289 U.S. 466, 470, 53 S.Ct. 698, 699, 77 L.Ed. 1321, while the trial judge has the privilege of commenting on the facts, his discretion is not arbitrary and uncontrolled but is judicial, to be exercised in conformity with the standards governing the judicial office. He may analyze and dissect the evidence "but he may not either distort it or add to it". It was further said that the influence of the trial judge on the jury is necessarily and properly of great weight and his slightest word or intimation is received with deference and may prove controlling. It was emphasized that it is the duty of the trial judge to use great care that an expression of opinion upon the evidence "should be so given as not to mislead, and especially that it should not be one-sided" and that "deductions and theories not warranted by the evidence should be studiously avoided". The misstatements of fact just noted by the trial court in the instant case, touched upon a very vital point in the evidence and notwithstanding the court's general statement to the jury that it should follow its own recollection, we cannot doubt that the charge was not only erroneous but also prejudicial. This fact appears all the more emphatically when those parts of the court's charge are considered which dealt with the defensive theories of the appellant, particularly the defense that the appellant did not know or understand that he owed income taxes on the value of the improvement represented by the Hunting Valley residence and that he had no wilful intent to evade or defeat his income tax liabilities. The defendant several times reiterated in his testimony that he did not know that he owed any taxes in addition to those set forth in his personal return for the tax years involved. Moreover, it was insist-

ed throughout the trial by the appellant's attorney and argued to the jury that the appellant was a man of intelligence, and in effect that the appellant had kept complete records of the house transaction which would have been a stupid thing to do if he had intended to violate the law. But the charge of the court to the jury makes it altogether clear that the court confused this insistence of the appellant and distorted it into meaning that the appellant's defense was that he did not understand that he owed an additional tax because he was "dumb" or "stupid" or "ignorant". An examination of the charge reveals that this particular defense was first correctly stated to the jury, but that the trial judge thereafter in an extended portion of his charge stated to the jury, repeatedly and insistently, that the appellant and his counsel relied upon the appellant's dumbness, ignorance, or stupidity as a defense to refute the idea of wilfulness on his part. Moreover, the prejudicial impact of such erroneous statements as to appellant's defense was compounded by the obvious effort of the court in the course of his remarks to ridicule such assumed defense on the basis of the convincing facts in the record as to the appellant's intelligence, experience, and ability.

Still another defect in the charge was the failure of the court to state fully and objectively the contentions of the appellant with respect to his purpose in building the residence in Hunting Valley. Appellant testified in substance that the project was first undertaken as a corporate project to preserve his working force between jobs, or to use as a backlog for labor. At the time construction began he had no intention that the house should be his own. He decided to move into the house in the early fall of 1949 when he learned that the market value of the house was far less than what he had in it. Later, he began to like the place and first decided that he would purchase it when he sold his house on Hemlock Road in June of 1950. He further testified that he did not report the house construction to his accountant until mid-April of 1951 because the sale of his old house was not "completed until June of 1950, which was in the fiscal year of the corporation ending May 31, 1951. So it became a problem of the fiscal year of the corporation of 1951". While the charge goes into meticulous detail in stating the specific contentions of the Government, the contentions of the appellant just referred to are given scant attention. Actually, the appellant's claim that the house was undertaken as a corporate project to preserve its working force, while referred to in the charge, is misconstrued by the court to mean that the appellant claimed that he was "philanthropical with his help, or solicitous to retain his labor". No such claim was advanced by appellant at any time. His only contention was that the project was designed to keep intact a working force for the benefit of the corporation, not as a favor to his men.

We do not agree with appellee's argument that the evidence of the appellant's guilt was so overwhelming that the errors in the court's charge should be disregarded or treated as inconsequential or harmless. Indeed, there are circumstances in the record, in addition to the facts detailed above, tending to show that the appellant intended from the beginning that the house in Hunting Valley should be his own, including representations made by the appellant in applying for a building permit, representations made to various suppliers of materials used in the construction of the house, statements and representations made to the Internal Revenue agents, and certain discrepant or contradictory statements in his own testimony. Nevertheless we are of the opinion that the errors in the court's charge, the charge having been duly objected to by appellant, dealt with such vital and sensitive issues in the case and are of such character that prejudice to the appellant cannot be doubted. Appellant was entitled to have his theory of the case stated to the jury fully and accurately and without distortion of the essential facts.

■ Certain other errors assigned by appellant require discussion since they concern issues that will be material upon the re-trial of the case. One such error is the appellant's insistence that he did not receive taxable income during the years that the new house was being constructed for the reason that there was an implied legal obligation during the period of construction to pay the corporation the reasonable value of the house, and for the further reason that the corporation as a matter of law had a mechanic's lien upon the house throughout the period of construction for the value of labor and material furnished, such lien continuing for sixty days after the last materials were provided or labor performed thereon.

■■ It may be conceded, as insisted by the appellant, that if he wrongfully diverted the funds of the corporation for the purpose of building a residence for himself, a court of equity at the suit of a proper party in interest would declare a lien upon the improvement in favor of the corporation, upon the theory of a contract implied in law because of the appellant's unjust enrichment at the expense of the corporation. But it does not follow that the cost of the improvement would not be taxable income to the appellant simply because the appellant's title or the title held by the appellant's wife was subject to the possibility of such a charge. The rationale of Davis v. United States, supra, which we think is controlling here, is that property or money received by a taxpayer in a manner which allows him freedom to dispose of it at will is taxable income even though it may have been obtained by fraud and his freedom to use it may be assailable by someone with a better title to it, and that "taxation is not so much concerned with the refinements of title as it is with actual command over the property taxed —the actual benefit for which the tax is paid". Gains or profits and income derived from any source whatever are included in gross income for the purpose of taxation, and this includes "not only lawful, but also unlawful gains, and an unlawful gain constitutes income when its recipient has such control over it that, as a practical matter, he derives readily realizable economic value from it". Davis v. United States, supra [226 F.2d 335].

Section 8310 of the Ohio General Code, effective in the tax years 1948 and 1949, provided as follows insofar as pertinent here with respect to a mechanic's lien:

"Every person who does work or labor upon, or furnishes * * * material * * * for erecting * * * a house * * * by virtue of a contract, express or implied, with the owner * * * of any interest in real estate, or the authorized agent of the owner * * * of any interest in real estate * * * shall have a lien to secure the payment thereof upon such * * * house * * * and upon the interest * * * of the owner * * * in the lot or land upon which they may stand * * * to the extent of the right, title and interest of the owner * * * at the time the work was commenced or materials were begun to be furnished by the contractor, under the original contract, and also to the extent of any subsequent acquired interest of such owner, * * * * "

On the basis of this statute it is argued by the appellant that the corporation, as a matter of law, had a lien upon the real property involved from the time that the first labor was performed or materials furnished in 1947 for the full amount of the cost of construction, and therefore that neither the appellant nor his wife received or realized an economic gain during the tax years. By virtue of such mechanic's lien, it is argued, the property was encumbered during the tax years to the full extent of the costs of the improvement and the taxpayer consequently neither derived an economic

value from it nor possessed freedom to dispose of the property at will.[1]

The Ohio statute has been construed to create a lien from the time of the first labor performed or material provided, until sixty days after final completion, and such lien is effective against a purchaser of the property in the interim. Schuholz v. Walker, 111 Ohio St. 308, 145 N.E. 537; In re Taylorcraft Aviation Corporation, 6 Cir., 168 F.2d 808. But the statute requires by its terms, as a condition to the existence of a lien, that the labor be performed or material furnished "by virtue of a contract, expressed or implied, with the owner * * *." Certainly in the instant case there was no express contract between the corporation and Benes or his wife for the construction of the residence, with the result that the appellant is compelled to insist upon the existence of an implied contract. In this connection it is important to bear in mind the distinction between a contract implied in fact and a contract implied in law, commonly referred to as a quasi contract. The distinction is well established and is clearly delineated by the court in the case of Miller v. Schloss, 218 N.Y. 400, 113 N.E. 337, as follows:

"'* * * The courts recognize by the language of their opinions two classes of implied contracts. The one class consists of those contracts which are evidenced by the acts of the parties and not by their verbal or written words—true contracts which rest upon an implied promise in fact. The second class consists of contracts implied by the law where none in fact exist—quasi or constructive contracts created by law and not by the intentions of the parties. A contract cannot be implied in fact where the facts are inconsistent with its existence, or against the declaration of the party to be charged, or where there is an express contract covering the subject-matter involved, or against the intention or understanding of the parties; or where an express promise would be contrary to law. The assent of the person to be charged is necessary, and, unless he has conducted himself in such a manner that his assent may fairly be inferred, he has not contracted. * * *

"'* * * A quasi or constructive contract rests upon the equitable principle that a person shall not be allowed to enrich himself unjustly at the expense of another. In truth, it is not a contract or promise at all. It is an obligation which the law creates, in the absence of any agreement, when and because the acts of the parties or others have placed in the possession of one person money, or its equivalent, under such circumstances that in equity and good conscience he ought not to retain it, and which ex aequo et bono belongs to another. Duty, and not a promise or agreement or intention of the person sought to be charged, defines it. It is fictitiously deemed contractual, in order to fit the cause of action to the contractual remedy. * * *' 218 N.Y. at pages 406–407, 113 N.E. at page 338." Alliance Assurance Co. v. United States, D.C., 146 F.Supp. 118, at page 121. See also, Keifer & Keifer v. Reconstruction Finance Corporation, 306 U.S. 381, 394, 59 S.Ct. 516, 83 L.Ed. 784.

While no cases have been cited to the court construing the mechanic's lien statute on this point, it would appear from the language and general purpose of the

---

1. Appellant does not contend that during the tax years the property was encumbered by a mechanic's lien directly in favor of the laborers and materialmen who performed labor and furnished supplies for its construction. Apparently the reason for this is that the record justifies the conclusion that such laborers and materialmen were paid by the corporation on a current basis as the work progressed, with the result that no indebtedness existed in their favor for any appreciable length of time to constitute the basis of a lien.

statute as construed by the Ohio courts that in order for a mechanic's lien to arise by virtue of an implied contract, the contract must be implied in fact as distinguished from a contract implied in law. See Seybold v. Pitz, 101 Ohio App. 316, 136 N.E.2d 666, 670, and cases cited therein. It has been held that the Ohio mechanic's lien statutes are to be construed strictly as to whether or not a lien attaches. Robert V. Clapp Co. v. Fox, 124 Ohio St. 331, 178 N.E. 586; Nelson v. Malik, 96 Ohio App. 251, 121 N.E.2d 687. A persuasive analogy is to be found in the Tucker Act (28 U.S.C.A. § 1346(a) (2)) which confers jurisdiction on Federal District Courts to entertain actions against the United States where the claim is based "upon any express or implied contract with the United States". The Supreme Court has construed this language to require the existence of a contract expressed or implied in fact and not to refer to contracts implied in law or quasi contracts. State of Alabama v. United States, 282 U.S. 502, 51 S.Ct. 225, 75 L.Ed. 492; Goodyear Tire & Rubber Co. v. United States, 276 U.S. 287, 48 S.Ct. 306, 72 L.Ed. 575; United States v. Minnesota Mutual Investment Co., 271 U.S. 212, 46 S.Ct. 501, 70 L.Ed. 911.

In the instant case, while the facts would possibly justify the conclusion that there arose from the transaction a contract implied in law to require the appellant or his wife to reimburse the corporation for value which was unjustly and wrongfully received, there is no factual foundation in the record for the existence of a contract implied in fact. On the contrary, the undisputed facts negative the existence of a contract implied in fact between the corporation and the appellant or his wife. No record was kept by the corporation showing that the corporation was furnishing labor and material to the appellant personally for the construction of a house. As pointed out, the corporate expenditures for the construction of the residence were charged at the appellant's direction to the accounts of 17 different customers, and the same expenditures were recorded in a house file which was kept under the control of appellant separate from the other records of the corporation, such file being assigned neither the name of a customer nor a reference number. The normal procedure where the corporation had a contract with a customer was to assign such customer a job reference number which would thereafter distinguish the account from the accounts of all other customers. These facts are clearly incompatible with an intention to enter into a contract or to create a contractual relationship.

The possibility that a charge might have been imposed against the property during the tax years by the corporation in the nature of a lien arising from a quasi contract or a contract implied in law would not affect the saleability of the property or the taxpayer's dominion and control over it during the tax years. A prospective purchaser of the property would not have constructive notice of such a potential lien or charge and could not be affected thereby in the absence of actual knowledge of the facts.

We have no doubt therefore that the appellant's argument that the value of the improvement did not constitute taxable income during the tax years because of the existence of a mechanic's lien or because of the possibility of an implied or constructive lien, is not well taken.

■ Next to be noted is the contention of the appellant that prosecution under count II of the indictment involving the tax year 1948 is barred by the statute of limitations of six years prescribed by 26 U.S.C. § 3748(a), Internal Revenue Code of 1939. The appellant's income tax return for 1948 was filed on January 20, 1949, and that date is stated in count II of the indictment as the date of the commission of the offense. The indictment was not returned until September 12, 1955, a period of six years, seven months, and twenty-three days after the commission of the alleged offense. To determine this question it is necessary to consider these further facts:

On March 12, 1954, before the expiration of the statute of limitations as to the offense, a complaint was filed against appellant before the United States Commissioner, charging him with filing a false and fraudulent joint income tax return on behalf of himself and his wife for the calendar year 1947. This date was approximately ten months before the statute of limitations would have run as to the offense charged in count II, since it was alleged that the offense was committed by the filing of a false individual tax return on January 20, 1949, for the year 1948. At that time no grand jury had been empaneled. In the meantime, on April 12, 1954, the appellant filed in the United States District Court for the Northern District of Ohio a civil action seeking to enjoin the United States Attorney from presenting to the grand jury any of the record or documentary evidence which had been obtained from the appellant or his corporation pertaining to the alleged offenses for the years 1947, 1948, 1949 and 1950. The United States Attorney and the appellant's attorney appeared before the District Court at chambers on the date of the filing of the action and at that time it was agreed between them that the United States Attorney would not present the evidence in question to the grand jury until subsequent to a hearing on the merits of the appellant's application for a restraining order and that, in consideration thereof, the court would not set for hearing the motion for a temporary restraining order. A grand jury was empaneled on April 19, 1954. The District Court on October 20, 1954, issued its order restraining the United States Attorney from presenting such evidence to the grand jury, an order which was dissolved on March 29, 1955. A motion for a rehearing or for a new trial was filed by the appellant on April 1, 1955, but was overruled on April 4, 1955. On April 1, 1955, a motion to stay proceedings was filed, and subsequently on May 12 and May 16, 1955, hearings on this motion were held. It appears that immediately subsequent to April 1, 1955,

the exact date not being determined, an agreement was entered into between the appellant's counsel and the United States Attorney wherein it was agreed that the appellant would not press for a determination of the motion to stay proceedings in the District Court, that he would not file an application for a restraining order with the Court of Appeals, that he would promptly perfect his appeal to the Court of Appeals, and that he would join with the United States Attorney in an application for an immediate hearing before the Court of Appeals. In turn the United States Attorney agreed that he would not present to the grand jury the evidence referred to until the disposition of the appellant's appeal by the Court of Appeals. On July 20, 1955, this court affirmed the ruling of the District Judge dissolving the restraining order, Benes v. Canary, 6 Cir., 224 F.2d 470, and on September 7, 1955, an order was entered in the District Court based upon this court's decision. On September 12, 1955, as heretofore noted, the evidence was presented by the United States Attorney to the grand jury and the indictment was returned on the same date.

It will thus be seen that the United States Attorney was under restraint of a direct court order from October 20, 1954, to March 29, 1955, not to present the documentary evidence in his possession to the grand jury, and for the periods April 12, 1954, to October 20, 1954, and from approximately April 1, 1955, to September 7, 1955, he had agreed not to present such evidence to the grand jury under an agreement with appellant's attorney which was made during the course of the civil litigation, the purpose of which was to prevent the use of the evidence.

In criminal actions it has been stated that the purpose of statutes of limitations is to afford immunity from punishment, People v. Steiger, 154 Misc. 538, 277 N.Y.S. 602, 606, and that such statutes are construed, in contradistinction to statutes applicable to civil actions, not as statutes of repose going to the remedy only, but as creating a bar

to the right of prosecution. State v. Bilbao, 38 Idaho 92, 213 P. 1025, 222 P. 785; State v. Steensland, 33 Idaho 529, 195 P. 1080, 13 A.L.R. 1442; People v. Lee, 356 Ill. 294, 190 N.E. 264; 22 C.J.S. Criminal Law § 223, pp. 350-351; 13 A.L.R., Annotation, p. 1446 et seq. As stated in State v. Steensland, supra:

"Statutes of Limitation in criminal cases differ from such statutes in civil cases, in that in civil cases they are statutes of repose, while in criminal cases they create a bar to the prosecution. 1 Wharton, Crim. Proc. 10th ed. § 367, p. 415; Moore v. State, 43 N.J.L. 203, 39 Am.Rep. 558; 17 R.C.L. § 56, p. 704."

■ And the general rule is further that an indictment, found after the expiration of the time for beginning prosecution, is barred by the statute of limitations and is not waived by the fact that the prosecution was withheld on account of an agreement with the accused, or by the fact that the accused procured continuances of the preliminary hearing from time to time until the period of limitation had expired. Commonwealth v. Werner, 5 Pa.Super. 249; People v. Ayhens, 85 Cal. 86, 24 P. 635; 22 C.J.S. Criminal Law § 235, pp. 365-366; 16 C.J., p. 231, Note 61. Section 3748(a) contains certain exceptions, none of which has application here. Thus, it is provided that the time during which a person is absent from the district wherein the offense is committed shall not be taken as any part of the time for the commencement of criminal proceedings. The undisputed fact is that the appellant was not absent from the district except at brief intervals during the limitation period. Also, where a complaint is instituted before a United States commissioner within the limitation period, the statute extends the time limitation until the discharge of the grand jury at its next session. But in this case, while a complaint was filed before the commissioner for the year 1947, no complaint was filed for the year 1948.

We are of the opinion upon the facts of this case that the offense alleged in count II of the indictment is barred by the six-year statute of limitations. Accepting the Government's argument that the period during which the injunction was in effect should not be counted, but not so deciding, the Government's case is not helped. The injunction was in effect for five months and nine days, and if the additional time is added until the motion for a new trial was overruled, there would be a total period of five months and fifteen days to be excluded during which the statute was tolled or suspended. Adding this additional time to the original expiration date of January 20, 1955, the limitation period would be extended to July 4, 1955, whereas the indictment was not returned until September 12, 1955. The remainder of the time during which the Government took no action was voluntary on its part, resulting from the agreements between the United States Attorney and the appellant, and under the principles of the authorities cited, with which we are in agreement, such voluntary action does not toll the statute of limitations in a criminal prosecution.

■ We have carefully considered other errors assigned by the appellant but find them to be without substance. The information sought by the bill of particulars was largely already in the possession of the appellant and we are satisfied that the information was not necessary to enable the appellant to prepare his defense or to avoid surprise at the trial. United States v. Skidmore, 7 Cir., 123 F.2d 604; Tinkoff v. United States, 7 Cir., 86 F.2d 868, certiorari denied 301 U.S. 689, 57 S.Ct. 795, 81 L.Ed. 1346, rehearing denied 301 U.S. 715, 57 S.Ct. 937, 81 L.Ed. 1366; Remmer v. United States, 9 Cir., 205 F.2d 277. The insistence that he was entitled to have suppressed evidence obtained as to his personal income taxes for the tax years as a result of the corporation having filed amended corporate income tax returns for said period, because of the voluntary disclosure policy of the United States Treasury Department which was then in effect, must also fail. There was noth-

ing in the Treasury Department's voluntary disclosure policy which would afford immunity to a taxpayer personally as the result of filing amended returns for a corporation owned and controlled by him. No personal amended tax returns were ever filed by the appellant.

A number of errors are assigned relating to rulings of the District Court upon the evidence, but without discussing such rulings in detail we find that they were well within the discretion of the court and that there is no basis for holding that the trial court was in error in this respect. Also, the special requests submitted to the court by the appellant for instructions to the jury were either covered in the court's general charge or included principles of law which had no application to the facts of the case as developed by the evidence.

Consistently with this opinion the judgment of conviction is reversed, and the case is remanded to the District Court with directions to dismiss count II of the indictment and for a new trial as to count III.