RECOMMENDED FOR FULL-TEXT PUBLICATION
Pursuant to Sixth Circuit Rule 206

ELECTRONIC CITATION: 2000 FED App. 0289P (6th Cir.)
File Name: 00a0289p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

UNITED STATES OF AMERICA,
    *Plaintiff-Appellee,*

v.

REBECCA K. CROSSLEY
(99-4076); STARLA GRUBICH
(99-4080),
    *Defendants-Appellants.*

Nos. 99-4076/4080

Appeal from the United States District Court
for the Northern District of Ohio at Akron.
No. 99-00114—James S. Gwin, District Judge.

Argued: March 16, 2000

Decided and Filed: August 30, 2000

Before: NORRIS, MOORE, and COLE, Circuit Judges.

_____

**COUNSEL**

**ARGUED:** Debra Kanevsky Migdal, Akron, Ohio, Mark H. Ludwig, COLE CO., L.P.A., Akron, Ohio, for Appellants. Christian H. Stickan, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee. **ON BRIEF:** Debra Kanevsky Migdal, Akron, Ohio, Mark H. Ludwig,

COLE CO., L.P.A., Akron, Ohio, for Appellants. Christian H. Stickan, ASSISTANT UNITED STATES ATTORNEY, Cleveland, Ohio, for Appellee.

———————

**OPINION**

———————

KAREN NELSON MOORE, Circuit Judge. Rebecca K. Crossley and Starla Grubich each were convicted of conspiracy to commit mail fraud and of a single mail fraud violation. On appeal, Crossley argues: (1) that the district court erred in denying her motion for a continuance of trial because she did not have thirty days between her first appearance through counsel and her trial as required under the Speedy Trial Act and because she was deprived of her Sixth Amendment right to prepare an adequate defense and her Fifth Amendment right to due process; and (2) that the district court erred in denying her motion for judgment of acquittal because there was insufficient evidence to support her conspiracy and mail fraud convictions. Grubich makes the following claims in her appeal: (1) that her mail fraud conviction was barred by the statute of limitations; (2) that she is entitled to a new trial because the district court violated the Speedy Trial Act; (3) that the district court erred in denying her motion to suppress statements made to FBI agents during an interview in which she was not advised of her *Miranda* rights; and (4) that the district court erred in denying her motion for judgment of acquittal of her conspiracy and mail fraud convictions. For the reasons stated below, we **AFFIRM** the convictions of Crossley and Grubich.

## I. FACTS AND PROCEDURE

Rebecca K. Crossley and Starla Grubich both were involved in an insurance scam conspiracy operating out of a branch office of Republic Claims Service Company in Akron, Ohio. Republic Claims is an insurance company based in Phoenix, Arizona that provides insurance for the customers of its parent company, U-Haul of America. It handles all

effective it must be clearly established that there was an intentional relinquishment or abandonment of a known right or privilege." *Id.* at 4 (citation and quotations omitted).

In this case, the district court asked Crossley's counsel whether he wanted to cross-examine Grubich after the government's cross-examination of Grubich, but the district court did not ask Grubich's counsel if he wanted to cross-examine Crossley at the conclusion of the government's cross-examination of Crossley. Grubich did not ask to cross-examine Crossley, and the district court did not deny Grubich the opportunity to do so. Unlike the defendant in *Brookhart*, Grubich could have spoken up and asked the court to cross-examine Crossley. The Seventh Circuit has held that a defendant waived his right to confront a witness where the defendant was not barred from cross-examining a witness and where his "failure to examine his codefendant was the product of his own inaction and not the result of governmental improprieties." *Trigg v. United States*, 430 F.2d 372, 374-75 (7th Cir.), *cert. denied*, 400 U.S. 966 (1970). Similarly, we conclude that Grubich waived her right to cross-examine Crossley when she remained silent at the conclusion of the government's cross-examination of Crossley and did not ask for the opportunity to conduct her own cross-examination.

In addition, Grubich raises several challenges to her sentence. These arguments were briefly set forth at the end of Grubich's brief in a section titled "End Note" and did not request relief. Moreover, Grubich has already fully served her six-month sentence. Therefore, we decline to address these matters.

### III. CONCLUSION

Based on the foregoing, we **AFFIRM** Crossley's convictions and Grubich's convictions.

damages claims from customers who rent trucks, trailers, or storage rooms from U-Haul. According to Republic Claims's standard practice, a claim filed in the Akron office initially would be handled by an adjuster, who would set up a file, investigate the claim, and determine whether a claim should be paid. The head clerk then would input the data into the computer, which would be sent to Republic Claims's home office in Phoenix via modem, and a check automatically would be issued. The check then would be mailed out by regular mail the same or the next business day.

In March of 1995, Republic Claims discovered that Martin Latson, an adjuster in the Akron office, was making false claims on behalf on claimants who were not part of the original claim file and was receiving checks for these false claims. Ernie Bernard McCalister also participated in the scam by receiving several checks from Republic Claims in exchange for a portion of the proceeds. At Latson's request, McCalister sought other individuals to act as nominees to receive checks based on false claims. He would approach a potential nominee, ask if he or she would cash an insurance check in return for a portion of the proceeds, and if the person agreed McCalister would ask for his or her name, address, and social security number. Once he obtained this information, McCalister would pass it along to Latson, who would use it to file a false claim and generate a claim check from Republic Claims.

McCalister approached both Crossley and Grubich to become nominees in the scam. McCalister and Grubich worked together at Camp Roulston, a military juvenile facility. Grubich had indicated to McCalister that she wanted to purchase a new computer, and McCalister told her that if she cashed a check for him, he would give her a portion of the proceeds to buy a computer plus any additional amount necessary for the purchase. Grubich agreed to McCalister's proposal, gave him her required personal information, received a check in the mail, cashed it, and then purchased a new computer with part of the proceeds. The check made out to Grubich was dated April 12, 1994, for the amount of

$4,000. McCalister then approached Grubich's roommate, Crossley, about becoming a nominee. Crossley agreed to participate and gave him her personal information. Republic Claims then issued a check in her name and sent it to the Akron office. McCalister gave the check to Crossley, who cashed it for him, and kept a portion of the money. Crossley's check from Republic Claims was dated April 26, 1994, for the amount of $3,562.

In the course of investigating this scheme, FBI Agent William P. Delagrange interviewed Crossley on May 14, 1997, and confronted her with a copy of the check from Republic Claims that she had endorsed. Crossley told Delagrange that she had received the check in exchange for entering computer data for McCalister. She then told him that she cashed the check, used $1,000 of the proceeds to buy a computer monitor, and gave the remaining balance to McCalister. Crossley then was interviewed by FBI Special Agent Dennis Archey on November 7, 1997. She told Archey that she had not entered any computer data for McCalister. Rather, she explained that McCalister had asked her to do some work for his new computer business and that he had offered to contribute half of the purchase price of a new computer printer for her if she cashed the check. Grubich also was interviewed by Archey on September 30, 1997, at Camp Roulston. When asked about the check she had cashed, Grubich explained that McCalister had told her that he needed her to cash the check in order to limit his tax exposure. Grubich admitted that she cashed the check and used $500 of the proceeds to purchase a new computer and that McCalister had contributed another $300 for the purchase.

Crossley and Grubich were both charged with conspiracy to commit mail fraud and with individual mail fraud violations in an indictment issued on April 14, 1999. Crossley was arraigned on May 6, 1999, and Grubich was arraigned on May 13, 1999. Trial began on June 7, 1999, and lasted for a day and a half. Both Crossley and Grubich testified at trial and admitted to cashing the checks, but denied any knowledge of the insurance scam. Crossley testified that McCalister asked

juror could have concluded that it was reasonably foreseeable to Grubich that the mails would be used when she provided her name, address, and social security number to McCalister for the issuance of a Republic Claims check.

In addition, a rational juror could have determined that Grubich knew that she was engaging in a scheme to defraud when she accepted the claims check for a "cargo loss," cashed the check, kept a portion of the proceeds, and gave the remaining balance to McCalister. Grubich was aware that she had never filed an insurance claim with Republic Claims and that she was not entitled to the $4,000 check for a cargo loss. She has provided conflicting explanations for cashing this check. At trial, she testified that McCalister had told her that he had recently started an insurance business and needed her to cash a check as a favor for him. When questioned by Special Agent Archey, Grubich explained that McCalister had asked her to cash the check to limit his tax exposure. Based on this evidence and Grubich's conflicting statements, a rational juror could have found that Grubich did in fact know that she was participating in some type of fraudulent scheme. Therefore, we hold that the district court did not err in denying Grubich's motion for judgment of acquittal of the mail fraud charge in Count 4 of the Indictment.

### 5. Additional issues

Grubich also argues that she was denied the opportunity to cross-examine her codefendant, Crossley. The Sixth Amendment provides that "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to be confronted with the witnesses against him." U.S. CONST. amend. VI. In *Brookhart v. Janis*, 384 U.S. 1, 6-8 (1966), the Supreme Court held that a defendant's constitutional right to confront witnesses could not be waived by counsel where counsel agreed to a truncated prima facie trial in which he would not be able to cross-examine the government's witnesses despite the defendant's expressed desire to plead not guilty. The Court reasoned that "[t]here is a presumption against the waiver of constitutional rights, and for a waiver to be

not to have continued liability for all acts committed by other members in furtherance of a conspiracy, she has the burden of proving that she withdrew from the conspiracy by showing that "she took affirmative action to defeat or disavow the purpose of the conspiracy." *United States v. Lash*, 937 F.2d 1077, 1083 (6th Cir.), *cert. denied*, 502 U.S. 949 (1991).

Here, the Indictment alleges several overt acts in furtherance of the conspiracy that fall within the five-year statute of limitations. As discussed above, Grubich received the Republic Claims check issued in her name no earlier than April 14, 1994. We also concluded above that there was sufficient evidence in the record to support the charge that Crossley participated in the conspiracy when she agreed to cash a claims check for McCalister and provided him with the necessary information. This check was issued by Republic Claims on April 26, 1994, and was sent out the same or next business day. These overt acts in furtherance of the conspiracy occurred within the five-year statute of limitations for conspiracy. Grubich has not presented any evidence that she ever withdrew from the conspiracy. Therefore, we hold that the government provided evidence from which a reasonable juror could conclude that Grubich's involvement in the conspiracy fell within the five-year statute of limitations.

### b. Mail Fraud Charge

Grubich also asserts that the district court should have granted her motion to acquit her of Count 4 of the Indictment, charging Grubich with mail fraud under 18 U.S.C. § 1341, because the government failed to prove that Grubich played a substantial part in the scheme to defraud or in the use of the mail since she only received one check in the mail. As discussed above, in order to establish a mail fraud violation the government need not show that the defendant actually used the mails, but must show "that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails." *Frost*, 125 F.3d at 354. A rational

her to cash a check for his new insurance business because he did not have a bank account yet. She also stated that once she received the check, she cashed it and gave the entire amount to McCalister. Similarly, Grubich testified that McCalister asked her to cash a claim check because he needed some help with his new insurance business. After she cashed the check, Grubich stated that she gave all of the money to McCalister. Grubich also testified that she had purchased her new computer with money she had been saving and that McCalister had contributed $100 to $150, but never told her that this money was a payment for cashing the check.

The jury found both Crossley and Grubich guilty of conspiracy to commit mail fraud and of one count of mail fraud. Following the district court's entry of judgment, Crossley and Grubich each filed a timely notice of appeal.

## II. ANALYSIS

### A. Rebecca K. Crossley

#### 1. Denial of Motion for a Continuance of Trial

Crossley asserts that the district court erred in denying her motion for a continuance on two grounds: first, that the district court violated the minimum thirty-day waiting period for trial required by the Speedy Trial Act, 18 U.S.C. § 3161(c)(2), and second, that the district court deprived Crossley of her Sixth Amendment right to prepare an adequate defense and her Fifth Amendment right to due process.

#### a. Speedy Trial Act

The Speedy Trial Act provides in pertinent part that:

Unless the defendant consents in writing to the contrary, the trial shall not commence less than thirty days from the date on which the defendant first appears through counsel or expressly waives counsel and elects to proceed pro se.

18 U.S.C. § 3161(c)(2). This provision "was passed to address the concern that a defendant be allowed sufficient time to prepare for trial." *United States v. Grosshans*, 821 F.2d 1247, 1252 (6th Cir.), *cert. denied*, 484 U.S. 987 (1987).

It appears that we have never been presented with the opportunity to examine when a defendant "first appears through counsel" in order to trigger the Speedy Trial Act's thirty-day waiting period. In *United States v. Daly*, 716 F.2d 1499, 1505 (9th Cir. 1983), *cert. dismissed*, 465 U.S. 1075 (1984), the Ninth Circuit concluded that a defendant's appearance at a bail hearing with counsel, appointed solely for the purpose of representing him at that hearing and not at trial, did not constitute the defendant's first appearance through counsel to begin the thirty-day period. The court reasoned that the Speedy Trial Act was enacted to guarantee a defendant a minimum of thirty days to prepare a defense and that in order "[t]o fulfill this policy, the 30-day period should commence only after the indictment or information has been filed and made public and a defendant has first appeared with counsel engaged or appointed to represent him at trial." *Id.*; *see also United States v. Storm*, 36 F.3d 1289, 1293 (5th Cir. 1994) (adopting the *Daly* court's reasoning and commencing the thirty-day period on the date on which the district court appointed new counsel after determining defendant could no longer be represented by previous counsel due to a conflict of interest), *cert. denied*, 514 U.S. 1084 (1995); *but see United States v. Darby*, 744 F.2d 1508, 1520 (11th Cir. 1984) (rejecting the Ninth Circuit's approach and concluding that because Congress did not place any qualification on the term "counsel," Congress intended § 3161(c)(2)'s thirty-day waiting period to commence when a defendant first appears through *any* counsel), *cert. denied*, 471 U.S. 1100 (1985).

In a more recent opinion, the Ninth Circuit clarified that the failure of a defendant's actual trial counsel to appear does not automatically prevent the thirty-day waiting period from starting. *See United States v. Bogard*, 846 F.2d 563, 566 (9th Cir. 1988), *superseded on other grounds as stated in Simpson v. Lear Astronics Corp.*, 77 F.3d 1170, 1174 (9th Cir. 1996).

however, that these distinguishing facts show that Grubich was questioned in a more hostile or coercive manner than the employee in *Mahan*.

Based on the totality of these circumstances, Grubich's interview with the FBI agents did not constitute custodial interrogation, and the FBI agents were not required to advise Grubich of her Fifth Amendment rights before interviewing her. Thus, the district court did not err in denying Grubich's motion to suppress her statements made in the course of the interview.

### 4. Denial of Motion for Judgment of Acquittal

### a. Conspiracy Charge

Grubich was charged with conspiracy to commit mail fraud in Count One of the Indictment. As discussed above, in order to establish a conspiracy violation, "the government must prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *United States v. Milligan*, 17 F.3d 177, 182 (6th Cir.), *cert. denied*, 513 U.S. 879 (1994); *see also United States v. Ables*, 167 F.3d 1021, 1031 (6th Cir.), *cert. denied*, 527 U.S. 1027 (1999); *United States v. Rogers*, 118 F.3d 466, 478 (6th Cir. 1997).

Grubich argues that the government failed to establish that one of the necessary elements of a conspiracy, the existence of a conspiracy agreement, occurred within the five-year statute of limitations. She contends that the statute of limitations began to run on the date on which she agreed to cash a check for McCalister and provided the necessary information to him, sometime before the check was issued on April 12, 1994. The government correctly points out that the statute of limitations for a conspiracy charge begins to run from the last overt act committed in furtherance of the conspiracy alleged in the indictment. *See United States v. Smith*, 197 F.3d 225, 228 (6th Cir. 1999). The statute of limitations does not start running on the date the conspiracy agreement was concluded. Moreover, in order for a defendant

complete freedom of movement throughout the interview, which lasted approximately one hour and thirty-five minutes, and was not arrested at its conclusion but instead returned to work. The FBI agent never made any showing of force or threatened arrest. *See id.* at 422. Similarly, Grubich was ordered to meet with the FBI agents at work, but the agents did not question Grubich about her employment and a reasonable person would not have believed that she was still under military orders from her superiors at work to continue the interview. The agents did not tell Grubich that she could not leave and she never asked or attempted to leave the room. Grubich had complete freedom of movement because she was not physically restrained in any way and was sitting close to the door in an unlocked room. The interview lasted for less than an hour, and Grubich was not arrested at its conclusion. In addition, the agents never made any showing of force, such as brandishing a firearm. Although Archey told Grubich that she could be arrested if she lied, a reasonable person would understand that this statement applies to anyone who lies to federal agents and was not specifically directed to her particular situation in that interview. We also note that Grubich was not questioned in a hostile or coercive environment. The room in which Grubich was interviewed was a relatively large classroom with windows, not a confined space which could be intimidating. *See Salvo*, 133 F.3d at 951 (considering the fact that defendant was interviewed in a large room with windows looking on a public space as non-intimidating).

Grubich responds that the *Mahan* case is distinguishable. First, the interview in *Mahan* was interrupted and moved to another room which gave the employee an opportunity to stop the interview, while Grubich's interview was not interrupted for such an opportunity. Second, the employee in *Mahan* could have a company representative with him during the meeting under the company's security policy, while Grubich did not have the benefit of being accompanied by a neutral party. Third, the employee in that case was questioned by one FBI agent who was accompanied by a local sheriff, while Grubich was questioned by two FBI agents. We do not agree,

In *Bogard*, the defendant's first appearance was made through a local counsel, whom the defendant's out-of-state principal trial counsel had designated to act on his behalf. The court concluded that this appearance through local counsel triggered the thirty-day waiting period, stating "[n]othing in the [Speedy Trial] Act suggests that we should disregard an appearance by counsel who was designated by the defendant's principal counsel to act on his behalf." *Id.* The defendant's principal counsel had been identified as such when the local counsel appeared with the defendant and had thirty days to prepare a defense as required under the Speedy Trial Act. *See id*.

When Crossley was arraigned on May 6, 1999, David Jack was noted as her appointed counsel. Jack was not present for the arraignment and Diane Doughtrey, the counsel of Crossley's codefendant Karen Rice, stood in for Jack. According to the parties, Jack did not appear before the court until the first day of trial on June 7, 1999. Crossley therefore argues that her Speedy Trial rights were violated because she did not appear through counsel until the first day of trial.

We conclude that Crossley appeared through counsel at her arraignment thirty days before trial in accordance with the Speedy Trial Act. Although Jack was not present at the arraignment, he was noted as Crossley's appointed counsel, and Crossley was represented by her codefendant's counsel. The facts surrounding Jack's absence at the arraignment are not known, but he had already agreed at that time to represent Crossley at trial. We find the facts of this case to be similar to the situation presented in *Bogard*, in which the Ninth Circuit concluded that the Speedy Trial Act's thirty-day waiting period began when defendant's primary out-of-state counsel asked local counsel to appear before the court on his behalf. *See* 846 F.2d at 566. The fact that another counsel stood in for Jack at the arraignment, after Jack had already agreed to represent Crossley at trial, does not prevent the commencement of the thirty-day waiting period. Crossley argues that unlike the local counsel in *Bogard*, the counsel of Crossley's codefendant was not authorized to act as her

counsel at the arraignment.  It appears, however, that the counsel did act on her behalf in helping her enter a not-guilty plea.

Moreover, because Jack already had agreed to represent Crossley, he had thirty days to prepare her defense.  We have noted that a defendant may not attempt to delay her trial by substituting counsel and then asserting that the thirty-day waiting period should automatically re-commence.  *See United States v. Richmond*, 735 F.2d 208, 214 (6th Cir. 1984) ("declin[ing] to hold that the thirty-day prohibition of commencement of trial is invoked whenever a defendant substitutes counsel. . . . [A] contrary conclusion would permit defendants by substituting counsel to delay their trial dates unduly in contravention of the intent of Congress in passing the Act").  Similarly, a defendant cannot delay her trial date on the basis that her appointed trial counsel was unable to attend her arraignment when she was represented by another counsel on her trial counsel's behalf.  Because Crossley was tried thirty days after her first appearance with counsel, the district court was not required to grant Crossley's motion for a continuance in order to comply with the Speedy Trial Act.[1]

### b.  Sixth and Fifth Amendment Claims

Crossley also argues that in denying her motion for a continuance the district court violated her Sixth Amendment right to prepare an adequate defense and her Fifth Amendment right to due process.  We review a denial of a motion for a continuance for abuse of discretion. *See United States v. Gallo*, 763 F.2d 1504, 1523 (6th Cir. 1985), *cert. denied*, 475 U.S. 1017 (1986).  "Denial amounts to a constitutional violation only if there is an unreasoning and arbitrary insistence upon expeditiousness in the face of a justifiable request for delay." *Id.* (quotations omitted).  In addition, "[t]o demonstrate reversible error, the defendant

---

[1]Moreover, even if Crossley established a violation of the Speedy Trial Act, she has not established that she suffered any actual prejudice. *See Grosshans*, 821 F.2d at 1253.

not informed of the interview ahead of time and was called to Camp Roulston's administrative offices during the work day.  An official at the camp chose the room for the interview, which was an unused classroom with windows.  The interview lasted for less than an hour.  Archey and Stone sat on one side of a table, while Grubich sat on the opposite side with her back to the door.  The door to the classroom was closed, but not locked.  Archey never told Grubich that she could not leave the room and never attempted to prevent her from leaving the room.  Grubich never asked to leave the room or to terminate the interview.  Archey did not have his gun drawn and used a business-like tone during the interview.  He explained that he did not warn Grubich of her Fifth Amendment rights pursuant to *Miranda* because he did not believe that she was in custodial interrogation.

Grubich argues that she was subject to custodial interrogation because she was unexpectedly summoned to Camp Roulston's administrative office and ordered by her military superiors to go to a classroom where she was confronted by the two FBI agents.  She asserts that she reasonably believed that she was not free to leave because a reasonable person would believe that a military officer must follow the orders of her superiors and thus could not refuse to meet with the agents.  Moreover, Archey told Grubich that she could go to jail if she did not tell the truth, which Grubich argues implied that she was in custody.

We conclude that Grubich was not subject to custodial interrogation.  The facts of this case are similar to those presented in *United States v. Mahan*, 190 F.3d 416 (6th Cir. 1999), in which we held that an employee questioned at work was not subject to custodial interrogation.  The employee in that case was brought to a conference room by a supervisor for an interview with an FBI agent.  The agent never told the employee that he could not leave, the employee never asked to leave, the doors to the interview rooms were unlocked, and the employee sat in the chair closest to the door.  When other employees needed to use the conference room, the employee voluntarily changed rooms to continue the interview.  He had

however, is limited to only "custodial interrogations," which have been defined as "'questioning initiated by law enforcement officers after a person has been taken into custody or otherwise deprived of his freedom of action in a significant way.'" *Salvo*, 133 F.3d at 948 (quoting *Oregon v. Mathiason*, 429 U.S. 492, 494 (1977)). In evaluating whether a defendant was in custodial interrogation, we look to the totality of the circumstances "to determine how a reasonable man in the suspect's position would have understood the situation." *Id.* (quotations omitted). One factor is whether a reasonable person in the suspect's situation would have believed that she was free to terminate the interrogation and leave. *See id.* at 950. We also have considered the following other factors:

> (1) the purpose of the questioning; (2) whether the place of the questioning was hostile or coercive; (3) the length of the questioning; and (4) other indicia of custody such as whether the suspect was informed at the time that the questioning was voluntary or that the suspect was free to leave or to request the officers to do so; whether the suspect possessed unrestrained freedom of movement during questioning; and whether the suspect initiated contact with the police or voluntarily admitted the officers to the residence and acquiesced to their requests to answer some questions.

*Id.*

In this case, on September 30, 1997, FBI Special Agents Archey and Stone went to Camp Roulston, Grubich's place of employment, to conduct an interview with Grubich. In the course of investigating the insurance scheme at Republic Claims, Archey attempted to interview all of the nominees who had received fraudulent checks, and he wanted to interview Grubich to determine how much money she had received from McCalister for participating in the scheme. After several unsuccessful attempts to reach Grubich at home by telephone, Archey made arrangements with officials at Camp Roulston to interview Grubich at work. Grubich was

must show that the denial resulted in actual prejudice to his defense." *Id.* (quotations omitted). "Actual prejudice" is established "by showing that a continuance would have made relevant witnesses available or added something to the defense." *United States v. King*, 127 F.3d 483, 487 (6th Cir. 1997), *cert. denied*, 522 U.S. 1130 (1998).

Crossley asserts that she promptly requested a three-week continuance at a pretrial hearing after the government waited to respond to her counsel's May 12, 1999 discovery request until May 26, 1999, the day before the pretrial hearing. While the government had a great deal of time to investigate and prepare its case, her counsel had two weeks after receiving the government's documents to evaluate the factually detailed indictment, contemplate and research the propriety of pretrial motions, review discovery, confer with defendant, and prepare an adequate defense. As evidence of actual prejudice, Crossley asserts that the denial of the continuance and lack of time to prepare a defense prevented her counsel from rasing issues relating to pre-indictment delay and from making appropriate challenges to the jury instructions.

We conclude that the district court did not abuse its discretion in denying Crossley's motion for a continuance. Although this case involves a conspiracy with several members, it is a relatively straightforward insurance scam and is not a complex case. As the government points out, it presented just four witnesses and the trial only lasted for a day and a half. The complexity of Crossley's case thus does not weigh in favor of the need for a continuance. *See Gallo*, 763 F.2d at 1523-24 (concluding that a district court abused its discretion in denying a prompt motion for a continuance where the defendant had only ten or eleven days to prepare for a highly complex RICO case). Although the government's late compliance with Crossley's discovery request left her counsel with only two weeks to prepare for trial after receiving the government's documents, Crossley has failed to establish the resulting prejudice. She makes the general claim that her counsel was unable to raise issues relating to pre-indictment delay or to make appropriate challenges to the jury

instructions, but she does not identify how this alleged prejudice is related to having received the government's materials at this late date. *See King*, 127 F.3d at 487 (requiring defendant to explain why her counsel's voir dire questions were deficient and to delineate what potential legal issues needed to be researched and why additional consultations were necessary to show actual prejudice from denial of continuance). We also note that Crossley's counsel waited over ten days to follow up on his May 12, 1999 discovery request. In light of these circumstances, we conclude that the district court did not abuse its discretion in denying Crossley's motion for a continuance of trial.

### 2. Denial of Motion for Judgment of Acquittal

We review a district court's denial of a motion for judgment of acquittal on the basis of insufficient evidence by examining "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979). This review is "quite limited." *United States v. Morrow*, 977 F.2d 222, 230 (6th Cir. 1992) (en banc), *cert. denied*, 508 U.S. 975 (1993). We do not weigh evidence, make credibility determinations, or substitute our judgment for the jury's verdict. *See United States v. Hilliard*, 11 F.3d 618, 620 (6th Cir. 1993), *cert. denied*, 510 U.S. 1130 (1994).

### a. Conspiracy Charge

In Count One of the Indictment, Crossley was charged with conspiracy to commit mail fraud. Pursuant to 18 U.S.C. § 371,

If two or more persons conspire either to commit any offense against the United States, or to defraud the United States, or any agency thereof in any manner or for any purpose, and one or more of such persons do any act to effect the object of the conspiracy, each shall be fined under this title or imprisoned not more than five years, or both.

district court stated that it would not issue a continuance to allow for additional discovery, there is no evidence that the court would have denied a motion for a continuance if the Speedy Trial Act violation had been brought to its attention. More importantly, Grubich has failed to identify any specific harm from the Speedy Trial Act violation, which left her attorney with approximately twenty-five days to prepare for trial instead of thirty days. The district court granted Grubich's motion for an extension to file pretrial motions, and Grubich's attorney filed a motion to suppress on her behalf. As noted above, this was not a factually complex case, the government presented only four witnesses, and the trial lasted for just one day and a half. Because Grubich failed to raise this issue before the district court and because she failed to satisfy her burden of showing that she actually was prejudiced by the untimely commencement of trial, we hold that Grubich is not entitled to a new trial.

### 3. Motion to Suppress

Grubich also argues that the district court erred in denying her motion to suppress statements she made during an interview by two FBI agents in alleged violation of her Fifth Amendment right against self-incrimination. In reviewing suppression issues, we review the district court's factual findings for clear error and its legal conclusions de novo. *See United States v. Salvo*, 133 F.3d 943, 948 (6th Cir.), *cert. denied,* 523 U.S. 1122 (1998). Whether a defendant was "in custody" is a mixed question of law and fact subject to de novo review. *See id.*

The Fifth Amendment states that a defendant cannot be "compelled in any criminal case to be a witness against himself." U.S. CONST. amend. V. In *Miranda v. Arizona*, 384 U.S. 436, 478-79 (1966), the Supreme Court determined that a suspect under custodial interrogation must be given notice of her Fifth Amendment right against self-incrimination. Any incriminating statements obtained in violation of *Miranda* may not be admitted and used against the defendant at trial. *See id.* at 479. The *Miranda* rule,

on May 13, 1999, and her trial began on June 7, 1999, in violation of the Speedy Trial Act. As discussed above, a defendant is entitled to a thirty-day waiting period after she "first appears through counsel" until she is tried. *See* 18 U.S.C. § 3161(c)(2). Because Grubich did not have thirty days between her first appearance through counsel and her trial, the district court violated the Speedy Trial Act in commencing her trial on June 7, 1999.

The Speedy Trial Act does not provide a sanction for violations of its thirty-day waiting period. We have held, however, that a "defendant must demonstrate that she was prejudiced by the untimely commencement of trial in order to obtain a new trial." *United States v. Grosshans*, 821 F.2d 1247, 1253 (6th Cir.), *cert. denied*, 484 U.S. 987 (1987). In *Grosshans,* the court stated that when a defendant fails to raise a Speedy Trial Act claim before the district court, she effectively waives it because "[h]ad defendant raised the statutory violation, there is no reason to believe that the District Court would not have corrected any error." *Id*. The defendant in *Grosshans* did not present a Speedy Trial Act objection to the district court and had several months to prepare for trial. The court concluded that the defendant was unable to show that she was prejudiced by the Speedy Trial Act violation and therefore was not entitled to a new trial. *See id.*

In the present case, Grubich did not make a Speedy Trial Act objection before the district court. Grubich argues that she did not raise this issue because the district court made it clear that it would not grant a continuance.[4] Although the

---

[4] A review of the pretrial hearing transcript shows that codefendant Crossley's attorney requested a continuance, without any mention of the Speedy Trial Act, because the government had been late in complying with his discovery request and that the district court denied the continuance. Grubich's attorney then requested an extension of time to file pretrial motions, such as a motion to suppress and a motion to sever. The district court judge stated, "I still won't continue the trial date," to which Grubich's attorney responded, "I'm not asking for a continuance at this point." J.A. at 330 (Hearing Tr.).

In order to establish a conspiracy, "the government must prove an agreement between two or more persons to act together in committing an offense, and an overt act in furtherance of the conspiracy." *United States v. Milligan*, 17 F.3d 177, 182 (6th Cir.), *cert. denied*, 513 U.S. 879 (1994). The government need not show a formal written agreement; "'a tacit or mutual understanding among the parties will suffice.'" *United States v. Ables*, 167 F.3d 1021, 1031 (6th Cir.) (quoting *United States v. Ellzey*, 874 F.2d 324, 328 (6th Cir. 1989)), *cert. denied*, 527 U.S. 1027 (1999). Circumstantial evidence which a reasonable person could interpret as showing participation in a common plan may be used to establish the existence of a conspiracy agreement. *See id.* The government is not required to prove that each member of a conspiracy knew every detail or the identity of all the other members involved in the conspiracy. *See United States v. Rogers*, 118 F.3d 466, 478 (6th Cir. 1997). The government, however, must show that a particular defendant knew the object of the conspiracy and "'voluntarily associated himself with it to further its objectives.'" *United States v. Gibbs*, 182 F.3d 408, 421 (6th Cir.) (quoting *United States v. Hodges*, 935 F.2d 766, 772 (6th Cir. 1991)), *cert. denied*, 120 S. Ct. 592 (1999).

Crossley argues that she did not have a mutual agreement or understanding with any of the members of the conspiracy because she had no knowledge about the nature, object, or persons involved in the conspiracy. It appears that McCalister did not provide Crossley with any specific details about the scam at Republic Claims, and Crossley denied any such knowledge at trial. Nevertheless, a rational juror could conclude that she did in fact know that a scam was involved and that she agreed to participate when she cashed the check for McCalister. The check, made out for $3,562, stated that it was for a "cargo loss." Crossley admitted that she knew she had not suffered a cargo loss and was not entitled to the $3,562. Crossley has provided several different explanations for cashing this check. At trial, she testified that she believed she was helping out McCalister with his new insurance business because he had not yet set up a bank account. When

confronted by FBI Special Agent Delagrange on May 14, 1997, Crossley explained that she had received the check in exchange for entering computer data for McCalister. Crossley later admitted that she never entered any computer data for McCalister. In an interview with FBI Special Agent Archey on November 7, 1997, Crossley stated that she had worked for McCalister's new computer business, in which he filed claims on damaged computers, and that in return for cashing the check, McCalister paid for half of her computer printer. In light of these conflicting explanations and Crossley's admission that she knew the check was for an insurance claim to which she was not entitled, a rational juror could have concluded that Crossley knew that she was involved in some type of insurance scam and thus adopted the conspiracy's main objective when she cashed the claim check for McCalister and kept a portion of the proceeds. The government did not have to show that Crossley knew all of the details or the identity of all the other members involved in the conspiracy and only had to show that Crossley had adopted the conspiracy's main objective. Therefore, we hold that the district court did not err in denying Crossley's motion for judgment of acquittal on this basis.

### b. Mail Fraud Charge

In order to establish a mail fraud violation under 18 U.S.C. § 1341, the government must prove the following elements: "'(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so.'" *United States v. Frost*, 125 F.3d 346, 354 (6th Cir. 1997) (quoting *United States v. Oldfield*, 859 F.2d 392, 400 (6th Cir. 1988)), *cert. denied*, 525 U.S. 810 (1998). The Supreme Court has stated that "'The Federal mail fraud statute does not purport to reach all frauds, but only those limited instances in which the use of the mails is a part of the execution of the fraud, leaving all other cases to be dealt with by appropriate state law.'" *Schmuck v. United States*, 489 U.S. 705, 710 (1989) (quoting *Kann v. United States*, 323 U.S. 88, 95 (1944)). To be considered "part of the

We note that other courts have held more generally that the statute of limitations begins to run on the date of the mailing. *See United States v. Barger*, 178 F.3d 844, 847 (7th Cir. 1999) (stating that "it is well settled that the statute of limitations for mail fraud begins running on the date of the mailing and not when the criminal scheme is complete") (citing *United States v. Dunn*, 961 F.2d 648, 650 (7th Cir. 1992)); *United States v. Pemberton*, 121 F.3d 1157, 1163 (8th Cir. 1997), *cert. denied*, 522 U.S. 1113 (1998); *United States v. Eisen*, 974 F.2d 246, 263 (2d Cir. 1992), *cert. denied*, 507 U.S. 1029 (1993). These cases are consistent with our holding because we do not believe that the "date of the mailing" was intended to have a restrictive meaning, limited to the date on which the relevant matter actually was mailed. The statute of limitations is concerned with the date on which the defendant completed the crime, and the mail fraud statute provides that a defendant may commit this crime in several different ways. Therefore, we interpret the date of the mailing to include, depending on the specific use of the mails charged in the indictment, the date on which the defendant placed, deposited, caused to be deposited, took, or received the mailing, or the date on which the defendant knowingly caused the mailing to be delivered.

As noted above, the check made out in Grubich's name was issued on April 12, 1994, and according to standard practice at Republic Claims the check would have been mailed from its Arizona office on April 12 or 13, 1994. Grubich would not have received the check in the mail in Ohio before April 14, 1999, and the Indictment was filed on April 14, 1999. Because Grubich, as charged in the Indictment, knowingly caused the check to be delivered by mail and also received the check in the mail within five years of the filing of the Indictment, her conviction of Count 4 is not barred by the statute of limitations.

### 2. Speedy Trial Act

Grubich also argues that her convictions should be reversed because she first appeared through counsel at her arraignment

bar to prosecution that may be raised for the first time on appeal.[3]

The statute of limitations begins to run when each element of the crime has occurred and the crime is complete. *See Toussie v. United States*, 397 U.S. 112, 115 (1970); *United States v. Lutz*, 154 F.3d 581, 586 (6th Cir. 1998). As discussed above, the offense of mail fraud includes the following elements: "'(1) devising or intending to devise a scheme to defraud (or to perform specified fraudulent acts); (2) involving a use of the mails; and (3) for the purpose of executing the scheme or attempting to do so.'" *Frost*, 125 F.3d at 354 (quoting *Oldfield*, 859 F.2d at 400). More specifically, mail fraud is committed where a defendant engages in one of the following uses of the mails: (1) "places in any post office or authorized depository for mail matter, any matter or thing whatever to be sent or delivered by the Postal Service," (2) "deposits or causes to be deposited any matter or thing whatever to be sent or delivered by any private or commercial interstate carrier," (3) "takes or receives therefrom, any such matter or thing," or (4) "knowingly causes to be delivered by mail or such carrier according to the direction thereon." 18 U.S.C. § 1341. Accordingly, we conclude that the offense of mail fraud is completed and the statute of limitations begins to run on the date on which the defendant, depending on the specific use of the mails charged in the indictment, "places," "deposits," "causes to be deposited," "takes," or "receives" mail, or "knowingly causes" mail "to be delivered" as part of the execution of a scheme to defraud.

---

[3]We note that this court recently made the general statement that "[t]he statute of limitations is an affirmative defense that may be waived under Federal Rule of Criminal Procedure 12(f) if not raised at or before trial." *United States v. Craft*, 105 F.3d 1123, 1127 (6th Cir. 1997). That case, however, is not controlling here because the defendant in *Craft* had raised the statute-of-limitations defense, and the court only had to determine whether the statute-of-limitations defense involved essentially undisputed factual issues that could be isolated from the merits such that the district court could issue a decision on the defense before trial. *Id.*

execution of the fraud," the Court further has instructed that "the use of the mails need not be an essential element of the scheme." *Id.* Instead, "[i]t is sufficient for the mailing to be incident to an essential part of the scheme, or a step in [the] plot." *Id.* at 710-11 (quotations and citations omitted). Finally, the government does not have to show that the defendant actually used the mails, but must show "that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business, or that a reasonable person would have foreseen use of the mails." *Frost*, 125 F.3d at 354.

Crossley contends that the government failed to prove that she had any knowledge of the scheme to defraud because she had no knowledge of the insurance scam at Republic Claims. However, as discussed above, a rational juror examining the evidence presented at trial could have concluded that Crossley knew that she was engaging in a scheme to defraud when she accepted the claims check for a "cargo loss," cashed it, kept a portion, and gave the remaining balance to McCalister.

Crossley also argues that the government did not prove that she was aware that the mails were being used in the scheme. The check made out to and endorsed by Crossley was initially sent to Republic Claims's Akron office. Once the check arrived, McCalister picked it up and gave it to Crossley. Because she did not receive the check in the mail and McCalister did not tell her that he planned to use the mails, Crossley now argues that she did not know or have reason to know that the mails would be used.[2] Although Crossley personally did not use the mails, a rational juror could conclude that such use was reasonably foreseeable to Crossley. When she agreed to cash a check for McCalister, Crossley gave him her mailing address. Crossley should have foreseen that the mails would be used in order for her to receive her check. Therefore, we conclude that the district

---

[2]In fact, Crossley testified at trial that she received her check in the mail at her address. According to Republic Claims, however, the check was mailed to its Akron office.

court did not err in denying Crossley's motion for judgment of acquittal of the mail fraud charge in Count 3 of the Indictment.

## B. Starla Grubich

### 1. Statute of Limitations

Under 18 U.S.C. § 3282, "no person shall be prosecuted, tried, or punished for any offense, not capital, unless the indictment is found or the information is instituted within five years next after such offense shall have been committed." In this case, Grubich was charged with violating the mail fraud statute in Count 4 of the Indictment issued on April 14, 1999. Although the Indictment alleges that Grubich committed this offense on April 14, 1994, Grubich's insurance claim check was issued on April 12, 1994. According to Republic Claims, once a check is issued it is mailed out on the same or next business day. Grubich argues for the first time before this court that because her check was mailed on April 12 or 13, 1994, and the Indictment was not issued until April 14, 1999, this count is barred by the five-year statute of limitations.

Although the parties do not raise this issue, we first must decide whether Grubich can raise a statute-of-limitations defense for the first time on appeal. In *Benes v. United States*, 276 F.2d 99, 108-09 (6th Cir. 1960), we stated that "the purpose of statutes of limitations is to afford immunity from punishment" and thus "creat[e] a bar to the right of prosecution." In that case, the parties had entered into an agreement under which the government agreed not to present certain evidence regarding tax evasion to a grand jury pending an appeal of a separate civil suit filed to prevent the government from presenting this evidence, and the statute of limitations expired during this period. The court stated that the statute of limitations "is not waived by the fact that the prosecution was withheld on account of an agreement with the accused, or by the fact that the accused procured continuances of the preliminary hearing from time to time until the period of limitation had expired." *Id.* at 109. The court then determined that the defendant's conviction had to

be reversed because it was barred by the statute of limitations, even though the defendant did not raise this issue before the district court. *See id.*

We subsequently reexamined this issue in *United States v. Del Percio*, 870 F.2d 1090, 1092 (6th Cir. 1989), which involved defendants who had signed waivers expressly extending the statute of limitations on any conspiracy and false statement charges because they believed that further inquiry would result in no criminal charges being brought against them. When the government then brought such charges against them, the defendants claimed that the statute of limitations is a non-waivable bar to prosecution. The court first noted that almost every other circuit court that has examined this issue has disagreed with the *Benes* court and has concluded that the statute of limitations is a waivable affirmative defense and does not affect a court's subject matter jurisdiction. *See id.* at 1093 (citing *United States v. Karlin*, 785 F.2d 90, 92-93 (3d Cir. 1986), *cert. denied*, 480 U.S. 907 (1987); *United States v. Meeker*, 701 F.2d 685, 687 (7th Cir.), *cert. denied*, 464 U.S. 826 (1983); *United States v. Walsh*, 700 F.2d 846, 855 (2d Cir.), *cert. denied*, 464 U.S. 825 (1983); *United States v. Williams*, 684 F.2d 296, 299 (4th Cir. 1982), *cert. denied*, 459 U.S. 1110 (1983)). The court then concluded that the *Benes* decision must be construed narrowly. *See id.* Because the defendants in *Del Percio* expressly had waived the statute of limitations, the court found the situation to be factually and legally distinguishable from *Benes* and held that the defendants had in fact waived their statute-of-limitations defense. *See id.* at 1093-94.

In this case, unlike the defendants *Del Percio*, Grubich did not expressly waive the statute of limitations for her mail fraud offense. Rather, as in *Benes*, the statute of limitations expired without the parties addressing this issue. Therefore, we must follow the law of the *Benes* decision and hold that, absent an explicit waiver, the statute of limitations presents a