UNITED STATES of America,
Plaintiff–Appellee,

v.

John L. ELLERBEE, Defendant–
Appellant.

No. 94–2278.

United States Court of Appeals,
Sixth Circuit.

Submitted Oct. 13, 1995.

Decided Jan. 16, 1996.

**106**

Stephen L. Hiyama, Asst. U.S. Attorney (briefed), Detroit, MI, for U.S.

Joan E. Morgan (briefed), Detroit, MI, for John L. Ellerbee.

Before: KENNEDY and MOORE, Circuit Judges; POTTER *, District Judge.

POTTER, D.J., delivered the opinion of the court, in which MOORE, J., joined. KENNEDY, J. (pp. 109–110), delivered a separate concurring opinion.

JOHN W. POTTER, District Judge.

Defendant/appellant appeals his criminal conviction and sentencing. Defendant, after a bench trial, was convicted of mail fraud, 18 U.S.C. 1341; using fictitious names to further a scheme to defraud, 18 U.S.C. 1342; and the interstate transportation of property taken by fraud, 18 U.S.C. 2314. The district court sentenced Ellerbee to a term of 24 months incarceration.

On appeal, oral argument was waived and this case was heard on the briefs. Appellant argues: (1) that the evidence presented at trial was insufficient as a matter of law to support a finding of guilt; (2) that the evidence presented was insufficient to support the District Court's finding, made at the sentencing phase that appellant engaged in "more than minimal planning" in order to support a two-level sentence enhancement; (3) that the trial court committed error by failing to depart downward in the sentencing guidelines due to Ellerbee's argued "minor role" in the mail fraud; and (4) that the trial court committed error in adopting a retail valuation of the goods in question in order to determine the "fair market value" required to determine appellant's sentence. For the following reasons, we affirm the conviction and sentence.

From the evidence presented at trial, viewed in the light most favorable to the prosecution, the following is a brief summary of the relevant facts. Ellerbee essentially ran a scheme whereby he would, under numerous false names, sign up with the Columbia House Record Club. As part of Columbia's "introductory offer" the club typically offered incentives to join, such as allowing the subscriber to purchase eight tapes, albums or CDS for one cent. The member was then obligated to purchase a minimum number (usually 6 or 8) items at regular price from the Club over the next two to three years. After receiving the free tapes (which he later resold on the street), Ellerbee would then refuse the later invoices that were sent to the false name at the addresses he utilized.

Appellant used his own address, 13303 East Canfield; that of his step-daughter, 4720 Coplin; or a third address, 4325 Eastlawn, for the deliveries. The addresses were all subdivided into nonexistent apartments, and the names were picked at random from the telephone book. Appellant submitted a total of 221 false membership applications,

---

* The Honorable John W. Potter, United States District Judge for the Northern District of Ohio, sitting by designation.

208 of the applications were from Ellerbee's address, five bore the Coplin address, and eight bore the Eastlawn address. As a result of the applications, Columbia House sent 1811 CDS and 506 cassettes to the Coplin and Canfield addresses.[1]

The total value of the items sent to the Canfield and Coplin addresses was placed at $31,670.00. This amount was reached from testimony by a Columbia employee, Margaret Ames, which placed a general value of $15.00 per CD and $10.00 per tape on the merchandise. Ms. Ames was unable, however, to testify as to who in Columbia House actually determined these figures or how they were determined.

■ In order to convict the appellant of mail fraud, the government had to establish the following elements:

1. the existence of a scheme to defraud;

2. use of the mail in furtherance of the scheme; and

3. culpable participation by the accused.

*See* 18 U.S.C. § 1341. The evidence presented is reviewed in the light most favorable to the prosecution, and the trial court's findings reversed only if the trial court's findings were "clearly erroneous." *United States v. Bashaw,* 982 F.2d 168 (6th Cir.1992).

■ Appellant's theory is that he was only a dupe in the scheme, whose master mind was an individual known only as "Derrick"; Derrick supposedly ran the operation and paid appellant only one dollar per tape. Appellant argues that since there is only equivocal circumstantial evidence of his guilt and no direct evidence, there was insufficient evidence to support his conviction. To support this proposition appellant relies on the case of *United States v. Leon,* 534 F.2d 667 (6th Cir.1976). The holding in this case is no longer good law. *See United States v. Stone,* 748 F.2d 361 (6th Cir.1984);[2] *see also Jackson v. Virginia,* 443 U.S. 307, 318–19, 99 S.Ct. 2781, 2788–89, 61 L.Ed.2d 560 (1979).

In *Jackson,* the Supreme Court held that in determining the sufficiency of evidence to support a criminal conviction "the relevant question is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson,* 443 U.S. at 318–19, 99 S.Ct. at 2789.

Ellerbee's reliance on *Leon* is therefore misplaced, and his subsequent argument and interpretation of the evidence is therefore baseless. The evidence viewed in the light most favorable to the prosecution, as related above, adequately supports Ellerbee's conviction.

Appellant also argues that "spillover" evidence unfairly biased the trier of fact, and that no proof was presented as to his specific intent to defraud. Both of these arguments actually pertain to the sufficiency of the evidence and, as discussed, above are without merit.

■ Appellant next argues that, at the sentencing phase of his trial, the district court erroneously found that appellant engaged in "more than minimal planning." This finding supported a two-level sentence enhancement. The trial court in sentencing may increase a convicted appellant's offense level by two points if the offense involved "more than minimal planning." U.S.S.G. § 2B1.1(b)(5). The appropriate standard of review of the trial court's finding of "more than minimal planning" in this instance is one of clear error. *United States v. Eve,* 984 F.2d 701 (6th Cir.1993).

Appellant argues that "more than minimal planning" means more planning than is necessary to commit the offense in its simplest form. *See* U.S.S.G. § 1B1.1, Commentary. Ellerbee maintains that "more than typical planning" would include creating dummy corporations, multiple bank accounts, etc. The argument follows that, since all appellant did

---

1. The CDS and tapes sent to the Eastlawn address were apparently not attributed to the defendant.

2. In *Stone,* the court held that "circumstantial evidence alone can sustain a guilty verdict and that to do so, circumstantial evidence need *not*

remove every reasonable hypothesis except that of guilt." *Stone,* 748 F.2d at 362. The court further held that previous decisions indicating approval of a contrary rule "are rejected and overruled." *Id.* at 363.

was fill out applications, the upward enhancement is improper.

■ Ellerbee's argument lacks merit. More than minimal planning does not require that the offense be committed in its most complicated form, as appellant impliedly argues; rather it just must be something more than the crime in its simplest form. "More than minimal planning" can be deduced by more planning than is typical, repeated acts, and steps to conceal the crime. In this instance, appellant committed the crime through filling out over two hundred applications (repeated acts), used false names and addresses (concealment), and picked over two hundred false names out of the telephone book (more than minimal planning). The evidence indicates that the enhancement was warranted.

Further, as pointed out by the government, one of the comments in the sentencing guidelines is particularly germane: "[m]ore than minimal planning is [also] deemed present in any case involving repeated acts over a period of time, *unless it is clear that each instance was purely opportune....*" U.S.S.G. § 1B1.1 comment n. 1(f) (emphasis added). *See also United States v. Ivery,* 999 F.2d 1043 (6th Cir.1993). As stated, this scheme involved repeated acts over 12 months, and each instance was as a result of the fraud-inducing efforts by the appellant, rather than being merely "opportune." The district court's finding that Ellerbee's offense involved more than minimal planning was proper.

■ With respect to his sentencing, appellant also argues that the district court committed error by failing to depart downward in the sentencing guidelines due to Ellerbee's argued "minor role" in the mail fraud. Ellerbee argues that he was only a small player in a larger scheme and that the mysterious Derrick was actually the criminal mastermind behind the plot to defraud Columbia House. This argument is totally without merit, and appears to be a repeat of Ellerbee's argument concerning the sufficiency of the evidence. Furthermore, appellant did not raise this issue before the district court. Ordinarily, this Court declines to address issues not raised in the court below. *See*

*United States v. Nagi,* 947 F.2d 211, 212–13 (6th Cir.1991). At best, the Court, would review for plain error. The evidence presented, reviewed in the light most favorable to the prosecution, shows that appellant was the major, if not sole, participant in the fraud scheme. The district court's failure to depart downward was not plain error.

■ The most interesting of appellant's assigned errors is his contention that the district court erred in calculating the amount of loss by adopting a retail valuation of the goods in question in order to determine the "fair market value" required to determine Ellerbee's sentence. The court's standard of review in this instance is also one of clear error. *United States v. Kohlbach,* 38 F.3d 832 (6th Cir.1994).

■ As the Sentencing Guidelines require that the amount of loss attributable to Ellerbee's fraud be taken into account in determining the pertinent sentencing range, U.S.S.G. § 2F1.1(b)(1), the Court must look to the meaning of "loss." Section 2B1.1, comment n. 2 of the Sentencing Guidelines defines "loss" as "the value of the property taken, damaged or destroyed." Ordinarily, when property is taken or destroyed the loss is the fair market value of the particular property at issue. Appellant argues that in this case, the goods should be valued at the $1.00 per tape for which appellant claims he sold the goods. In the alternative, appellant argues that, since the club membership provided that the eight albums could be had for a penny as long as the member eventually bought six additional albums, the loss, as calculated by using the unit value per tape or CD, should be averaged out over fourteen albums instead of the eight "free" albums received per membership.

Appellant cites *United States v. Warshawsky,* 20 F.3d 204 (6th Cir.1994), as supporting the proposition that, where the retail market has no application to the crime in question, then it is improper to use a retail valuation to establish the market value of the goods. *Warshawsky,* however, dealt with fraud amongst wholesalers, and the victim was a player in the wholesale market; thus in that

case, it was inappropriate to use the retail value of the goods. *See Id.* at 213–14.

Because of the market place distinction, *Warshawsky* does not apply to the scenario before this Court. In the case at bar, Columbia was acting in the retail market place by selling to consumers. Moreover, Ellerbee was acting in this same market by selling the albums to these same consumers. It would also be a mistake to say that the valuation arrived at was by use of a "retail" price; in actuality, evidence presented showed that Columbia tended to market its products somewhat below retail price, and it was Columbia's prices that were used to establish the goods' fair market value. Simply because Columbia chose to offer the introductory goods at a substantial discount as an incentive to join the record club does not mean that the market value of the goods was somehow lessened. *See United States v. Colletti*, 984 F.2d 1339 (3rd Cir.1992) (rejecting appellant's argument that, since the victim typically discounted diamonds, the discount price should be utilized in determining loss); *see also United States v. Williams*, 50 F.3d 863, 864 (10th Cir.1995) (where items were stolen from retailer, proper to measure loss by retail value rather than wholesale value); *United States v. Larracuente*, 952 F.2d 672, 674 (2d Cir.1992) (use of retail value of bootleg tapes proper where high quality of tapes would allow their sale in a retail market); *United States v. Austin*, No. 92–50609, 1993 WL 181364 (9th Cir.1993).

In this instance, there is adequate evidence to support the valuation arrived at by the District Court. The appellant's proposed method of valuation may, in fact, be a more accurate method of determining Columbia's loss; however, the fact that it may be the more accurate of the two methods does not make the district court's determination clearly erroneous. *See* U.S.S.G. § 2F1.1, comment n. 8; *Colletti*, 984 F.2d at 1345; *United States v. Jackson*, 25 F.3d 327, 330 (6th Cir.1994). The finding is not clearly erroneous.

The conviction and sentence are AFFIRMED.

KENNEDY, Circuit Judge, concurring.

I concur in the panel's opinion except for the valuation of the fraudulently obtained goods. The District Court decided the fair market value of the stolen property based on the testimony of an employee of Columbia House Record Club ("Columbia") that the "generic values" of a compact disc and cassette tape were $15 and $10 respectively. However, not only did Columbia actually sell the specific products involved for less, but also there was no showing that *anyone* sold these products for those prices.

In this case, we are presented with the question of whether value should be determined by reference to the price for which Columbia tapes and cassettes are sold in retail stores, or whether value should be determined by the amount actually charged by Columbia for these particular labels. The latter market is easily ascertained and appropriate in this case. *See United States v. Warshawsky*, 20 F.3d 204 (6th Cir.1994). In *Warshawsky*, we rejected consideration of retail price where "the retail market has literally no connection to th[e] case." *Warshawsky*, 20 F.3d at 213.

The value of the property taken is said to reflect the harm to the victim and the gain to the defendant. U.S.S.G. § 2B1.1, comment. (backg'd.). The hypothetical retail prices of compact discs and tapes assigned by Columbia to its tapes and cassettes but not charged are irrelevant to either of these considerations. Columbia does not normally receive the purported "retail prices" for these goods and the record suggests that the defendant's gain was well under the property's supposed retail value. Therefore, the suggested prices of the property reflect neither the gain to the defendant nor the harm to the victim. Furthermore, there was no evidence presented that *any* buyer or seller pays these prices.

The prices of the compact discs and cassettes actually charged by Columbia, on the other hand, are easily ascertained and are a truer reflection of market value. Essentially, a "club member" receives eight CD's for free and then is obligated to buy six more at $15 a piece. Using these figures, the market value is $6.43/compact disc. This, rather than the

assigned "generic values," accurately reflects the market value of the stolen goods.

*United States v. Colletti,* 984 F.2d 1339 (3d Cir.1992), on which the panel relies, is distinguishable. In *Colletti,* defendant was prosecuted for the robbery of a diamond courier, who was to deliver diamonds to a discount jeweler. The retail value of the diamonds was $626,000. According to the defendant, the discount seller, to whom the diamonds were to have been delivered, would have marketed them at a 25% discount of that price. Defendant further noted that the insurer settled the jeweler's claim for $289,000. Nevertheless, the appeals court held that there was adequate evidence in the record to support an actual market value of greater than $500,000 and therefore the district court's decision was not clearly erroneous. *Colletti* may be distinguished in that the parties in that case appear to have agreed that the $626,000 figure did represent the actual retail value of the stolen merchandise. In this case, the parties were not in agreement and the only proof offered for the fair market value of the stolen goods was the disputed testimony of an admittedly uninformed witness.

The panel rejects *Warshawsky* because it dealt with fraud amongst wholesalers and the victim was a player in the wholesale market. But *Warshawsky* similarly involved theft of a product with a hypothetical "suggested retail price" upon which the district court based its valuation. *Id.* at 212. As in *Warshawsky,* in this case the market value found by the District Court has little connection to the case. *Warshawsky,* 20 F.3d at 213. In both cases, there was no showing that the merchandise would ever have been sold in a retail outlet at the prices suggested by the government.

Fair market value, rather than being measured by an hypothetical market, is easily measured in this case by the amount for which Columbia sells its merchandise. Where there is such a readily available means to determine the fair market value of merchandise, I believe it is clearly erroneous not to employ it. "If some market value for the stolen property is readily-ascertainable, the sentencing court must proceed to the second part of the test by assessing the extent to which the market value adequately measures the harm to the victim or the gain to the defendant." *Warshawsky,* 20 F.3d at 213.

The government argues, "[T]he ultimate purchasers of this fraudulently obtained merchandise, who bought it on the street, are the very same people who would otherwise buy the same goods at retail stores," and thus the victim is harmed in not making those sales. Why isn't it just as likely that the "ultimate purchasers" would otherwise have bought the same goods through Columbia? In any event, rather than positing a hypothetical foregone retail purchase at a hypothetical price, we have held that market value should be determined by the price at which the victim offered the goods for sale rather than a fictitious retail price. *Warshawsky,* 20 F.3d at 213 (citing *United States v. Perry,* 638 F.2d 862, 865 (5th Cir.1981)).

Since there exists a readily-ascertainable market value in this case, it is appropriate to **VACATE** the sentence and **REMAND** for an inquiry into the fair market prices of compact discs and cassette tapes as sold by Columbia.