**UNITED STATES of America,
Plaintiff–Appellee,**

v.

**Allen Eugene MONDAY, Defendant–
Appellant.**

No. 99–6678.

United States Court of Appeals,
Sixth Circuit.

April 18, 2001.

Before KEITH, SILER, and CLAY, Circuit Judges.

CLAY, Circuit Judge.

Defendant, Allen Eugene Monday, appeals from the judgment of conviction entered by the district court on December 10, 1999, following Defendant's jury trial conviction for one count of being a felon in possession of firearm in violation of 18 U.S.C. § 922(g)(1), and one count of being a felon in possession of ammunition in violation of 18 U.S.C. § 924(e). On appeal, Defendant raises issues of prosecutorial misconduct in seeking to have his convictions reversed. For the reasons set forth below, we AFFIRM Defendant's convictions on both counts.

## BACKGROUND

On March 17, 1998, a federal grand jury sitting in the Eastern District of Tennessee returned a two-count indictment against Defendant, an armed career criminal, charging him with being a felon in possession of a firearm on September 30, 1996 in violation of 18 U.S.C. § 922(g)(1) in Count One, and with being a felon in possession of ammunition on September 30, 1996 in violation of 18 U.S.C. § 924(e) in Count Two. Following a two-day jury trial, Defendant was found guilty on both counts. Defendant was sentenced on November 23, 1999 to a term of 262 months of imprisonment. Defendant's judgment of conviction and sentence was entered on December 10, 1999, and it is from this judgment that Defendant now appeals.

### Facts

The following statements and testimony were elicited at trial.

#### A. Opening Statements

During opening statements, the prosecutor commented that "[t]his case is about why a previously convicted felon cannot have a firearm or ammunition." (J.A. at 32.) Defendant did not object to the prosecutor's comment. Rather, defense counsel countered by stating as follows in his opening statement:

Ladies and gentlemen, this case is not about why a previously convicted felon cannot have a firearm. If you want to know why a previously convicted felon cannot have a firearm, I will read it to you. It's 18 USC § 922(g). "It shall be unlawful for any person who has been convicted in any court of a crime punishable by imprisonment for a term exceeding one year to possess in or affecting commerce any firearm or ammunition." That is why a previously convicted felon cannot have a firearm, because it is against the law. This case is not about that. This case is about whether a previously convicted felon, my client, possessed the Rossi .38 that my learned adversary has told you about and the ammunition along with it on or about September 30, 1996.

(J.A. at 38–39.)

#### B. Government's Witnesses

##### a. Officer Larry Murrell

At about 2:55 a.m. on Monday, September 30, 1996, Officer Larry Murrell of the

Knoxville Police Department responded to a "[w]oman lying in the hallway" call on the fourth floor of the Parkway Hotel ("the Hotel") in Knoxville, Tennessee. (J.A. at 40.) Upon arriving at the scene. Officer Murrell found a white female lying in a pool of blood; the paramedics had just arrived and had not yet attempted to revive the woman. The Hotel offers apartments for rent, and upon viewing the scene, Officer Murrell observed "a trail of blood coming from apartment 400 where someone had drug her out." (J.A. at 42.) At this point of Officer Murrell's testimony, defense counsel objected on the basis that this testimony was not relevant to the charge of being a felon in possession of a gun. The district court overruled defense counsel's objection, opining as follows:

> Counsel, I am not sure [what this has to do with the charge.] I assume that this proof is being introduced to somehow tie this particular individual to the defendant. I don't know just, not knowing any more about the facts than what I have already heard here, that is it. If it turns out this is not relevant, I will sustain your objection. At this point I can't, I will overrule it.

(J.A. at 42.) Officer Murrell waited for his partner, Officer Cathy Pappas to arrive; upon her arrival, Officer Murrell knocked on the door of apartment 400 and Jack Monday, Defendant's brother, answered. Upon doing so, Officer Murrell noticed that no one else was in the apartment with Monday; however, Murrell also noticed that there was blood all over the living room and a live .38 caliber bullet on the floor.

### b. Officer Cathy Pappas

Officer Pappas testified that she arrived on the scene shortly after Officer Murrell in response to an "injured person call;" and that upon arriving she noticed the paramedics, who by this time were "working on" a white female who was lying on the floor in the hallway. (J.A. at 46.) Officer Pappas also testified as to the trail of blood that she observed from the body leading to apartment 400. Officer Pappas corroborated Officer Murrell's rendition of what happened after Murrell knocked on the door of the apartment, while noting that what was later determined to be blood and gray matter were found on the floor of the apartment. The officers advised Monday that there was someone in the hall that had been hurt, to which Monday inquired as to "how bad she had been shot." (J.A. at 48.) Officer Pappas added that Monday was handcuffed and placed under arrest at this time. Pappas stated on cross-examination that no gun was recovered from the apartment.

### c. Lieutenant Gordon Catlett

Lieutenant Catlett testified that he went to the scene after hearing that two of his officers, Murrell and Pappas, had responded to a call regarding an injured person at the Parkway Hotel. Upon arriving at the scene, Lieutenant Catlett observed "a white female victim laying in the hallway [with] blood all around her. She had suffered a single shot wound to the head...." Catlett also testified that he observed "blood in a smear mark in the hallway ... coming from the apartment [400] ... almost indicat[ing] that her body had been drug from that apartment to where she ended up laying in the hallway." (J.A. at 52.) Catlett soon realized that the woman was deceased.

Catlett remained with the body while Murrell and Pappas talked to Monday; Catlett soon heard someone "clomping" down the hall who later turned out to be Defendant. Defendant was wearing cowboy boots, blue jeans, no shirt, and was carrying a can of Coke in his hand. According to Catlett, Defendant walked up to

him and said, "well, here I am." (J.A. at 55.) When Catlett asked Defendant what he knew about the incident, Defendant replied, "she shot herself." (J.A. at 55.) Lieutenant Catlett testified that he then asked Defendant if he knew where the gun was, because "[a]t that time we [the police] did not know where the murder weapon was." (J.A. at 55 .) Defense counsel objected to Catlett's remarks stating that "I object to that answer. This is not a murder trial. This is a gun possession trial. The indictment does not charge murder." (J.A. at 55.) The district court overruled the objection, opining as follows:

It isn't a murder case. That is true. These are circumstances surrounding a situation that I assume are relevant. I am going to overrule. The jury will have to decide how relevant they are. They do have some relevance because your client was there and he was discussing it with the police officers. I overrule your objection.

(J.A. at 55–56.) Lieutenant Catlett then relayed the following conversation that he had with Defendant:

Anyway, I said, like I said, where is the gun. He said, well, it is in her hand. Well, I knew that wasn't true because she didn't have anything in her hands. I said, well she doesn't have it in her hand. He said, well, it is in her boot. I said, she is wearing tennis shoes. Then he said, well, it is under her. I said the paramedics have moved her to check her. At that time I knew he had some involvement in the homicide. I knew something that he wasn't telling me. I told him to put his hands on the wall because I was going to pat him down and take him into investigative custody.

(J.A. at 56.) Catlett instructed Defendant to put his hands on the wall so that Catlett could do a pat down and take Defendant into custody. In the process of doing the pat down search, Catlett noticed that Defendant had a blood stain on the crease of his wrist and claw marks on his back and his arm, as if someone had been trying to fend him off. The Lieutenant claimed that at that point Defendant became a homicide suspect, so the Lieutenant stopped asking him questions and handcuffed Defendant.

Defendant was transported to the police station and Catlett remained on the scene to look for the gun. Lieutenant Catlett noticed an open bedroom window without a screen in apartment 400. Because the window was open, the Lieutenant thought that the gun may have been thrown out of the window, so he went down the stairs and· found a .38 caliber revolver on the pavement below the window. Catlett testified that it struck him odd that the gun did not have any grips on it, so he looked around and found the grips lying in the immediate area. Catlett concluded that the impact from the gun hitting the pavement from the fourth floor forced the grips to splatter off. Lieutenant Catlett left the gun where he found it and waited for the criminalistics officer, Dan Crenshaw, to arrive.

### d. Officer Dan Crenshaw

Officer Crenshaw, senior evidence technician with the Knoxville Police Department, testified that he arrived on the scene at approximately 3:36 a.m. to collect evidence and to take pictures. Crenshaw stated that he confiscated the .38 caliber bullet found in apartment 400 as well as the .38 caliber Rossi revolver found outside the building. He later found and seized another live .38 caliber bullet from inside the living room couch. Crenshaw went to the morgue and recovered the slug taken from the victim's body, who by this time was identified as Beverly Reichenback. (J.A. at 83–84.) Crenshaw testified that

the gun was "fingerprinted," but that no fingerprints were found. (J.A. at 85.)

e. Investigator Tom Pressley

Investigator Pressley testified that he interviewed Defendant twice that day at the police station; one time at 6:03 a.m., and one time at 1:00 p.m. Defendant told Pressley that he resided at the Parkway Hotel in apartment 400. During the first interview, Defendant told Pressley that he had a .38 caliber five-shot Rossi and that he had gone practice shooting the day before the incident. (J.A. at 91–92.) During the second interview, Defendant stated that the deceased female "had gotten his gun out from under a stuffed dog and that they were struggling for the gun and he ended up grabbing the gun away from her and it went off." (J.A. at 94.) Defendant told Pressley that at one time he had about thirty bullets for the gun, but that he only had about four bullets remaining which he kept under the stuffed dog along with the Rossi. Defendant also allegedly informed Pressley that he had acquired the Rossi by trading a Derringer for it. According to Pressley, Defendant stated that the victim found the gun on the day in question and was going to sell it for drugs. However, Pressley also noted that Defendant provided many renditions regarding the gun, claiming on one occasion that the weapon was a "community project" gun. (J.A. at 108.)

f. Officer Anders

Officer Anders videotaped Defendant three days after the shooting. At this time, Defendant claimed that he and his brother were inside apartment 400 when the victim was shot; Jack Monday (Defendant's brother) was asleep on the couch and the victim was seated next to Monday. Defendant claimed on the video that he noticed that the victim had his gun so "he reached and grabbed it and ... was standing in front of her ... and she grabbed his hand and during the struggle ... it fired." (J.A. at 114.) Defendant further claimed that he dragged the victim's body into the hallway in an attempt to get her to the hospital, but that she was too heavy for him to carry; therefore, Defendant laid her down and tried to give her CPR. He told Officer Anders that someone named "Jackie" had left the gun in his apartment a long time ago. Defendant further conveyed that he had shot the gun about ten to fifteen times while at a family farm about three days prior to the victim's death. Defendant admitted that he threw the gun out the bedroom window after the victim was shot.

g. Dr. Paul Googe

Dr. Googe, the medical doctor who performed the autopsy on the victim, testified that she died from a single gunshot wound to the head. Defense counsel objected to Dr. Googe's testifying as to the victim's age at the time of her death. However, the court allowed the Doctor to state that the victim was thirty-six years old inasmuch as the victim's age had already come into evidence.

C. Defendant's Witnesses

Defendant proffered three character witnesses who testified that Defendant was not known to possess firearms or ammunition. One of these character witnesses was Defendant's brother, Jack Monday, who testified that he lived in apartment 400 and that Defendant did not live in the apartment with him. According to Monday, Defendant lived on the second floor of the Hotel with a woman named Anne Dolens, who was Defendant's girlfriend. Monday claimed that the victim owned the gun that killed her, and that he had been holding it for her for about six months.

He added that the victim was a drug addict and that she had talked about killing herself.

Monday recounted that on the night before the shooting, he invited Defendant over to his apartment, and that he was asleep on the couch at the time that the victim was shot and did not awaken at the sound of the gunfire. However, Monday believed that the woman's death was a suicide.

### D. Government's Rebuttal Witnesss

#### a. Sheila Miller

The government called Sheila Miller in rebuttal who testified that she resided on the fourth floor of the Hotel, and that at the time of the shooting, Defendant lived in apartment 400. Miller claimed that she was in her apartment sleeping and was awakened by the sound of a female screaming and a gun going off. After the shooting, she heard a door open, a dragging sound, and then a man say "God damn, man, you didn't have to fucking shoot her." (J.A. at 212.) Thereafter, Miller heard rustling in the hall, people going down the back stairs, and then it got quiet. Miller stated that within seconds later, she observed a van speed out of the parking lot. (J.A. at 214.) A couple of days later, Miller stated that she heard Defendant convey to several people in the Hotel lobby that "ah, man, don't worry about me.... [T]hey are not going to nail me.... I did them a favor.... Just another whore off the street." (J.A. at 217–18.)

#### b. Dr. Googe

During rebuttal, Dr. Googe testified that it was unlikely that the victim shot herself inasmuch as the wound appeared to be a "distant gunshot wound" because there was no sign of powder burns or other bullet fragments on the victim's forehead.

### E. Jury Instruction

The district court provided the following charge to the jury, as agreed to by the parties:

> I caution you, members of the jury, that you are here to determine the guilt or innocence of the accused from the evidence in this case. The defendant is not on trial for any act or conduct or offense not alleged in the indictment. Thus, you are not to concern yourselves with whether or not the defendant was criminally involved in the death of Beverly Reichenbach because the defendant is not charged with that offense in this case.

(J.A. at 165; 28A.)

The jury found Defendant guilty on both counts of the indictment.

## DISCUSSION

"When reviewing challenges to a prosecutor's remarks at trial, we examine the prosecutor's comments within the context of the trial to determine whether such comments amounted to prejudicial error." *United States v. Carter*, 236 F.3d 777, 783(6th Cir.2001) (citing *United States v. Young*, 470 U.S. 1, 11–12, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985)). In doing so, the Court first determines whether the remarks appear improper and then the Court looks to see whether the remarks were flagrant so as to warrant reversal. *United States v. Carroll*, 26 F.3d 1380, 1388 (6th Cir.1994). The Court considers the following factors when determining flagrancy: (1) whether the statements tended to mislead the jury or prejudice the defendant; (2) whether the statements were isolated or among a series of improper statements; (3) whether the statements were deliberately or accidentally placed before the jury; and (4) the total strength

of the evidence against the accused. *United States v. Monus*, 128 F.3d 376, 394 (6th Cir.1997) (citing *United States v. Cobleigh*, 75 F.3d 242, 247 (6th Cir.1996)).

However, when defense counsel fails to make a contemporaneous objection to the prosecutor's comment at trial, the Court will review only for plain error. *Carter*, 236 F.3d at 783. " '[B]efore an appellate court can correct an error not raised at trial there must be (1) error, (2) that is plain, and (3) that affect[s] substantial rights. If all three conditions are met, an appellate court may then exercise its discretion to notice forfeited error, but only if (4) the error seriously affect[s] the fairness, integrity, or public reputation of judicial proceedings.' " *Id.* (quoting *Johnson v. United States*, 520 U.S. 461, 466–67, 117 S.Ct. 1544, 137 L.Ed.2d 718 (1997)); *see United States v. Olano*, 507 U.S. 725, 732–33, 113 S.Ct. 1770, 123 L.Ed.2d 508 (1993).

A. Prosecutor's Remark During Opening Statements

■ Defendant first claims that the following statement made by the prosecutor during opening statements was improper: "Good morning ladies and gentlemen. This case is about why a previously convicted felon cannot have a firearm." (J.A. at 32.) Defendant contends that the prosecutor's opening remark "was clearly an attempt to hold the Defendant in this case responsible for unlawful possession of a firearm and ammunition by all persons charged with similar offenses." Defendant's Brief on Appeal at 11. Defendant also contends that this remark amounted to reversible error inasmuch as a prosecutor is not allowed to urge jurors to convict a criminal defendant in order to protect community values, preserve civil order, or deter future lawbreaking. Defendant further maintains that for the prosecutor to suggest that the case was about why a previously convicted felon cannot have a firearm or ammunition is to assume at the beginning of the trial that Defendant is automatically guilty.

The government argues that it was not plain error for the prosecutor to make the remark, where the remark was immediately followed by a recitation of the evidence that the jury would hear, no other similar remark was made in the opening statement, and defense counsel strongly countered the remark in his opening statement.

In *United States v. Young*, the Supreme Court cautioned that the plain error doctrine should not be used lightly as a means of correcting an otherwise forfeited error:

The plain-error doctrine of Federal Rule of Criminal Procedure 52(b) tempers the blow of a rigid application of the contemporaneous-objection requirement. The Rule authorizes the Courts of Appeals to correct only particularly egregious errors, those errors that seriously affect the fairness, integrity or public reputation of judicial proceedings. In other words, the plain-error exception to the contemporaneous-objection rule is to be used sparingly, solely in those circumstances in which a miscarriage of justice would otherwise result. Any unwarranted extension of this exacting definition of plain error would skew the Rule's careful balancing of our need to encourage all trial participants to seek a fair and accurate trial the first time around against our insistence that obvious injustice be promptly redressed. Reviewing courts are not to use the plain-error doctrine to consider trial court errors not meriting appellate review absent timely objection—a practice which we have criticized as extravagant protection.

470 U.S. 1, 15, 105 S.Ct. 1038, 84 L.Ed.2d 1 (1985) (internal quotation marks and citations omitted). With this cautionary stan-

dard in mind, we will now apply the four-part test for determining whether the forfeited error at issue may be considered reversible error. As noted, these factors consist of the Court determining whether the remark constituted (1) error, (2) that is plain, and (3) that affects substantial rights. If all three conditions are met, the Court may then exercise its discretion to notice forfeited error, but only if (4) the error seriously affects the fairness, integrity, or public reputation of judicial proceedings. *See Carter*, 236 F.3d at 783–84.

We agree that an argument can be made that the remark was error and that the error was plain inasmuch as the remark may have misled the jury by framing the case in such a way that assumed Defendant was guilty. Specifically, when the prosecutor remarked that this case is about *why* a convicted felon should not carry a weapon—as opposed to stating that this case is about *whether* a convicted felon was in possession of a weapon on September 30, 1996—the prosecutor may have misstated the issue and misled thereby constituting plain error. *See Carter*, 236 F.3d at 785 (citing A.B.A., ABA Standards for Criminal Justice Prosecution Function and Defense Function 3–5.8(a) (3d ed. 1993) ("The prosecutor should not intentionally misstate the evidence or mislead the jury as to the inferences it may draw.")).

However, even assuming that the remark was plain error and that it affected Defendant's substantial rights by misleading the jury, we are not of the belief that the remark seriously affected the fairness, integrity, or public reputation of the proceedings to the extent that Defendant was prejudiced. For example, the remark was isolated, it was followed by the prosecutor providing a complete rendition of what the evidence would show, and defense counsel vehemently counter-argued in his opening

statement. *See United States v. Leon*, 534 F.2d 667, 679 (6th Cir.1976) (finding that an isolated improper remark during a long trial may be considered harmless), *abrogated on other grounds, United States v. Ellerbee*, 73 F.3d 105 (6th Cir.1996). In addition, the proof offered against Defendant by the government was overwhelming in this case. As a result, the remark did not affect the fairness of the proceedings. *See United States v. Tocco*, 200 F.3d 401, 421 (6th Cir.2000) (finding that although the prosecutor's comments were improper, they did not rise to the level of reversible error inasmuch as the comments were isolated and constituted a very small portion of the total evidence against Tocco); *see also Pritchett v. Pitcher*, 117 F.3d 959, 964 (6th Cir.1997) (noting that this Court will not overturn a guilty verdict unless the prosecutor's alleged misconduct was "so pronounced and persistent that it permeate[d] the entire atmosphere of the trial, ... or so gross as probably to prejudice the defendant").

To go one step further, however, even assuming that the remark prejudiced Defendant, the court's instruction to the jury provided a sufficient cure. *See Carter*, 236 F.3d at 787 (finding that prejudice caused by a prosecutor's improper remark may be cured by a cautionary instruction from the court). Specifically, the district court cautioned the jury as follows:

> I caution you, members of the jury, that you are here to determine the guilt or innocence of the accused from the evidence in this case. The defendant is not on trial for any act or conduct or offense not alleged in the indictment. Thus, you are not to concern yourselves with whether or not the defendant was criminally involved in the death of Beverly Reichenbach because the defendant is not charged with that offense in this case.

(J.A. at 28A.) It is true that the district court did not provide this cautionary instruction to the jury until the close of proofs, well after the remark was made in opening statements, and that the instruction's lack of proximity to the remark would cut against a finding the instruction was curative if defense counsel had objected. *See Lent v. Wells,* 861 F.2d 972, 977 (6th Cir.1988) (finding that trial court's cautionary instruction did not cure the prejudice because the instruction was not given at the time of defense counsel's objections). However, under a plain error analysis, it could be said that the instruction cured any prejudice here because the instruction set forth what the case was about and what the jury should consider in determining guilt or innocence. In other words, if the remark misled the jury as to the issue in the case, the instruction just before deliberations was a fresh reminder as to what the issue actually was in this case, and therefore corrected the error. *See Carter,* 236 F.3d at 787.

Accordingly, Defendant's first allegation of prosecutorial misconduct fails where Defendant did not demonstrate that the remark at issue affected the fairness and integrity of the proceedings so as to require correction of the forfeited error.

### B. Testimony Elicited at Trial/Trial Strategy

Defendant next argues that "the government attempted to try the case as a homicide trial, and said strategy amounted to prosecutorial misconduct to such an extent as to warrant a reversal of the conviction." Defendant's Brief on Appeal at 12. In support of his claim Defendant relies upon those instances delineated in the statement of facts section of this opinion wherein Defendant objected to the prosecutor's elicitation of testimony which, according to Defendant, mischaracterized this case as one for murder. For example, Defendant

claims that the prosecutor's question to Officer Murrell which elicited the testimony that Officer Murrell noticed a trail of blood from the victim's body to apartment 400, amounted to misconduct warranting reversal.

Interestingly, in his brief on appeal, Defendant also argues in support of reversal that "[w]hen defense counsel's objection was denied, reversible error was committed by the trial judge because the trial, which was brought as a gun possession trial, became a murder trial." However, Defendant does not raise the issue of whether the district court abused its discretion in overruling defense counsel's objection to the admission of this and other statements, thereby waiving a challenge to the evidence on this ground for appellate review. *See* Fed. R.App. P. 28(a); *Bickel v. Korean Air Lines Co., Ltd.,* 96 F.3d 151, 153 (6th Cir.1996) (holding that issues must be raised in statement of questions presented and argued in legal brief in order to be considered by the appellate court).

As to his claim for prosecutorial misconduct, Defendant simply cites cases in support of the proposition that reversal is required when the prosecutor's misconduct was so pronounced and persistent that it permeated the entire trial. It appears that Defendant is actually attempting to argue that the prosecutor's framing of the case and elicitation of trial testimony was calculated to mislead the jury into believing that this was a murder trial—and more importantly that Defendant was the murderer—thereby resulting in prejudice warranting reversal of Defendant's conviction.

 As noted when discussing Defendant's previous allegation of error, a prosecutor is not allowed to mislead the jury regarding the evidence or inferences that may be drawn therefrom. *See Carter,* 236

F.3d at 785. However, we do not believe that the prosecutor's questions to various witnesses as to matters such as the trail of blood leading from the victim to apartment 400 misled the jury. The prosecutor had to provide a background for the recovery of the weapon and ammunition, and had to link Defendant to these items in order to prove that Defendant was a felon in possession of a gun and ammunition. There was testimony that Defendant lived in apartment 400, that live .38 caliber bullets were found in apartment 400, that Defendant had traded a Derringer for the .38 Rossi, and that the victim died from a single gunshot wound to the head. Therefore, the prosecutor's attempt to link the body with apartment 400 did not mislead the jury as to the crimes for which Defendant was charged. *See United States ex rel Bradley v. Lane*, 834 F.2d 645, 652 (7th Cir.1987) (finding that the prosecutor's comments were not improper because they were representative of accepted advocacy techniques and merely set forth the prosecutor's version of the case). *Compare Carter*, 236 F.3d at 787 (holding that the prosecutor erroneous representation of the evidence and assertion that defense counsel was lying "adversely influenced the jury's ability to assess [the witness'] credibility and to evaluate her in-court identification of [the defendant] as the robber, in contrast to her previous identification of Terry Johnson as the robber").

We are not persuaded by Defendant's claim that testimony elicited by the prosecutor from Sheila Miller regarding statements she overheard such as a man's voice saying, "God damn. man. you didn't have to fucking shoot her," and Defendant commenting that "ah. man. don't worry about me.... [T]hey aren't going to nail me.... I did them a favor, just another whore off the street," misled the jury. Although it is true that these statements may have implicated Defendant as having shot the victim, they also imply that Defendant was in possession of a gun and ammunition which is the crime for which he was charged.[1] In addition, where the evidence against Defendant was so overwhelming, the prosecutor's questions cannot be said to be so flagrant as to require reversal. *See Monus*, 128 F.3d at 394.

Moreover, like Defendant's previous claim, any possible prejudice was cured by the trial court's instruction to the jury wherein the court cautioned the jury that "Defendant is not on trial for any act or conduct or offense not alleged in the indictment." Therefore, the jury was instructed by implication that this was not a murder trial and that Defendant was not on trial for murder; accordingly. Defendant's claim on this issue fails. *See Carter*, 236 F.3d at 787 (finding that prejudice caused by a prosecutor's improper remark may be cured by a cautionary instruction from the court).

## CONCLUSION

For the above stated reasons, we AFFIRM Defendant's judgment of conviction.

---

1. For similar reasons, we are not persuaded by the other allegations of improper elicitation of testimony regarding matters such as the description of the apartment, the victim's age, or the victim's cause of death.