**NOT RECOMMENDED FOR FULL-TEXT PUBLICATION**
**File Name: 06a0639n.06**
**Filed: August 24, 2006**

**No. 04-2070**
**No. 04-2401**

**UNITED STATES COURT OF APPEALS**
**FOR THE SIXTH CIRCUIT**

| | |
|---|---|
| UNITED STATES OF AMERICA, | ) |
| | ) |
| *Plaintiff-Appellee,* | ) |
| | ) |
| v. | )On Appeal from the United States |
| | )District Court for the Western |
| | )District of Michigan |
| JOHN M. BIRNIE, II, AND | ) |
| EMALEE BIRNIE | ) |
| | ) |
| *Defendants-Appellants*. | ) |

Before: **BOGGS, Chief Judge; BATCHELDER, Circuit Judge;** and **WEBER, District Judge.**[*]

**PER CURIAM.**

Defendants appeal 1) the district court's denial of their Motions for Acquittal; 2) the district court's rejection of defendants' jury instruction; 3) the sentences imposed, in particular the enhancements to increase the guideline range; and 4) the alternative sentences imposed.

---

[*]The Honorable Herman J. Weber, Senior United States District Judge for the Southern District of Ohio, sitting by designation.

In light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), we conclude that a remand for resentencing is necessary so that the district court may determine a sentence with the knowledge that the sentencing guidelines are advisory. Therefore, we **VACATE** the sentences of John M. Birnie II and Emalee Birnie and **REMAND** for re-sentencing. As to the other issues on appeal raised by the defendants, we **AFFIRM** the district court's judgment.

On May 22, 2003, a federal grand jury returned a 32-count indictment against Terrance C. Hanson, John M. Birnie II, and Emalee Birnie. Counts 1 through 10 charged all defendants with wire fraud in violation of 18 U.S.C. § 1343; Counts 11 through 20 charged Terrance C. Hanson with knowingly converting and, without authority, selling, conveying and disposing of certain real property owned by the government in violation of 18 U.S.C. § 641; Counts 21 through 30 charged defendants John and Emilee Birnie with receiving, concealing, or retaining a thing of value exceeding $1,000.00 in violation of 18 U.S.C. § 641; Count 31 of the indictment charged defendants with committing money laundering in violation of 18 U.S.C. §§ 1956, 1957, and 1961. Count 32 of the indictment was a forfeiture count seeking forfeiture of the interests of defendants John and Emilee Birnie in various real and personal property pursuant to 18 U.S.C. 981(a)(1)( C).

Hansen entered into a plea agreement and pleaded guilty to Counts 1 through 20 on March 26, 2004. Defendants John and Emilee Birnie proceeded to trial. On April 16, 2004, after five days of trial, a jury returned verdicts of guilty on all charges against them. On July 23, 2004, each was sentenced by the United States District Court to 41 months in prison pursuant to the United States Sentencing Guidelines and, in the alternative, a sentence of 30 months' imprisonment in anticipation of the *Booker* decision. They filed timely Notices of Appeal.

In a separate proceeding, Terrance Hanson had also pleaded guilty to charges of unlawful sale of property to his family members.

## I. FACTUAL BACKGROUND

We set out the facts in the light most favorable to the government and as apparently believed by the jury in reaching its verdicts.

This case involves a scheme to defraud the Department of Housing and Urban Development (HUD) through the purchase of HUD properties for far less than market value and in violation of HUD guidelines. HUD, through the Federal Housing Authority (FHA), guarantees the repayment of certain qualified mortgage loans originated by approved lenders. When a mortgage loan for real property insured by the FHA goes into default and the lender forecloses, HUD pays the outstanding balance of the mortgage to the lender and assumes ownership of the real property. HUD then coordinates the disposition of the foreclosed property.

Terrance Hanson began working for HUD in 1971. At all times relevant to this case, Hanson was the Real Estate Owned (REO) Chief in the department that handled HUD-acquired single-family properties located in Grand Rapids, Michigan. His primary duty was to oversee the handling and disposition of HUD properties. Historically, he had the authority to enter into contracts on behalf of HUD with contractors who performed services for HUD.

Hanson entered into a contract with defendant Emalee Birnie to serve as a contractor to the Grand Rapids office of HUD. Under her first contract, she performed the duties of a Real Estate Asset Manager (REAM) and as a closing agent. Initially, her responsibilities in her role as REAM were to make certain that the property was clean and secure, including having a HUD lockbox on it, doing an initial inspection, removing snow and cutting the grass, and making sure she hired

3

contractors to do any repairs that might raise health or safety issues. She received $100.00 per property. In her role as closing agent, she was responsible for overseeing the closing of HUD sales of single-family properties to third parties. She was to prepare the deed and settlement statement, collect the net proceeds at the closing, deposit them in a non-interest-bearing escrow account, and have the funds wire transferred to the United States Treasury for HUD. In less than a year, her contract changed without being resubmitted for a bidding process. From then on, Emalee Birnie received $1,500.00 per property, plus a one percent bonus on the sale price of each house. She became responsible for all the minor repairs to the property, all cleanouts from the property, lawn care, and snow removal. All such expenses were to be paid out of the $1,500.00 fee. She also continued to act as a closing agent with the same responsibilities.

Hansen allowed her to share these responsibilities with her husband and co-defendant, John Birnie. Hansen apprenticed him as a closing agent. John Birnie was authorized to contract on behalf of HUD, and to be the closing agent when Emalee Birnie was unable to attend a closing.

Hanson's department had meetings during which the rules and responsibilities of the REAM were explained, as well as the rules of HUD. Any time there was a change in HUD rules and regulations, a REAM meeting was held during which the changes were discussed.

In late 1997, the process for bidding the REAM contract was changed and Hanson lost the authority to determine who would receive it. Subsequently, the defendants lost the contract. Hanson admitted it was at this point that he realized the Birnies could purchase properties, an activity they had been prohibited from engaging in while under the REAM contract. He began to develop a scheme with John and Emalee Birnie whereby they could purchase properties from HUD without going through the bid procedure and he made special arrangements for them to purchase the

4

properties at a discounted price. Hanson admitted that it made his job easier by reducing his inventories without having to advertise, hold openings, and contact, meet, and answer questions from various brokers and salespeople. He also testified that he felt in this way he could make up for the Birnies' loss of the REAM contract.

Hanson testified that both the Birnies were real estate brokers who were knowledgeable about the proper procedure by which to purchase a home from HUD because they had participated in such purchases. Hansen explained the normal procedure during his testimony at trial:

> The normal procedure is that when a property is acquired by HUD, that there is an appraisal made on the property to determine a value to the property for which we would list the property either in the newspaper or later on the Internet that would be open to sealed bid by private individuals through a real estate broker for which to submit an offer on the property, and the bidding period initially was fifteen days. Later it changed to ten. And initially it was open to owner-occupants and investors, the bid period. At some point in time during the mid-90's it changed to where the initial bid period was available to owner-occupant purchasers only. (J.A. page 1170).

Talking specifically about 1998 and 1999, Hanson confirmed that only owner-occupants were allowed to bid during the initial bid period after an advertisement in the newspaper. Other witnesses at trial confirmed Hanson's testimony. As one witness characterized it, the "cardinal rule" of HUD sales involved setting a listing price at an appraised value, advertising the property to the public, and making sure all bids remained sealed until the bid opening at a disclosed time and place.

Their scheme allowed the Birnies to circumvent these procedures in order to purchase HUD homes which should not have been available to them as investors at a discounted price before the properties were made available to the public or put into the bidding process.

5

Hanson testified about one of the eleven properties listed in the indictment, a typical transaction involved in the scheme. First, he contacted the manager and ordered an appraisal. Then a REAM went out to evaluate the property, noting a recommended listing price. In the example, this figure was $40,000 to $45,000. Then a contract appraiser went out and did an appraisal. Hanson testified that this was usually a very dependable indicator of what the property would sell for. In the example, this number was $20,000. Hanson entered a false price, $10,000, into the HUD system known as SAMS, because entry of a price into the system was a prerequisite to being able to sell the property. A contract was written for the property setting a selling price of $500.00, although Hanson admitted the property was worth $20,000. In this example, the contract was dated before the appraisal. Hanson admitted that this was proprietary knowledge, that this property was never advertised, that there was no bidding process. It was a private deal. In this example, Emalee Birnie was the closing agent and received $200 for acting as the closing agent.

The Birnies purchased this property and the other properties at significant discounts at a time when they would not have been eligible because they were not owner-occupants. The properties involved should have been sold through a bidding process. Immediately after their purchase of the properties, the Birnies insured the properties for a far higher, and more realistic, price. Shortly thereafter, they sold the properties on land contracts at a price close to the appraised values.

Defendants' knowledge of the fraudulent nature of their actions is clear. As real estate brokers, they went through the bidding process numerous times. As closing agents, they were continually updated on HUD rules and regulations. Based upon their experience, they knew the amounts they paid were unrealistically low. Right after each sale, defendants insured the properties for a much higher, more realistic price. Hansen had six partially-completed HUD Sales contracts signed by John Birnie in his desk at the time of his termination. Emalee Birnie was the closing agent when Hanson fraudulently sold houses to his wife and his stepchildren.

## II. DISCUSSION

The two appellants raise identical issues, except in the context of the sentencing guideline calculations. We will, therefore, discuss the issues topically making references as necessary to the facts pertaining individually to each appellant's argument.

## A. SUFFICIENCY OF THE EVIDENCE

Defendants allege the district court erred when it denied their Rule 29 Motions for Acquittal on the basis that the government's evidence was insufficient to sustain convictions on Counts 1 - 10 alleging wire fraud, Counts 21 - 30 alleging theft of government property, and Count 31 alleging money laundering.

Defendants argue that, to be convicted of wire fraud, it was necessary for the government to show that each defendant made a material misrepresentation. Relying on *Neder v. United States*, 527 U.S. 1 (1999), they argue that it was legally insufficient to show only that defendants were part of a scheme to defraud that included material misrepresentations made only by a co-defendant. Defendants claim that the evidence was that they purchased properties from HUD in violation of policies, procedures, and appraisals which would have been known by and available only to Hanson

7

and HUD.  They argue they were totally ignorant of the demonstrated disparity between the fair market value (FMV) and purchase price, and that the government's evidence consisted entirely of misrepresentations made by Hanson.

Defendants' second argument is that without a conviction on the wire fraud counts, the remaining counts, including allegations of theft of government property, under counts 21-30, and money laundering under count 31, would not be supported since they require the element of fraudulent taking.

The government argues that it is not necessary to prove that each of the defendants made a material misrepresentation, but that it is legally sufficient to prove that the scheme involved material misrepresentations.  The government claims the defendants knew HUD regulations and procedures and could foresee the misrepresentations and fraudulent acts necessary to the success of the scheme to defraud.  Furthermore, the government argues, the defendants did make material misrepresentations.  Lastly, the government argues that the other charges do not depend on the wire fraud charges.

In determining whether sufficient evidence supports a conviction, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt."  *United States v. Ellerbee*, 73 F.3d 105, 107 (6th Cir. 1996)(quoting *Jackson v. Virginia*, 443 U.S. 307, 318-19 (1979).  We draw all reasonable inferences in favor of the prosecution.  *United States v. Oldfield*, 859 F.2d 392, 399 (6th Cir. 1988)

8

As the government notes, defendants moved for acquittal only at the close of the government's case, and did not renew the motion at the close of all the evidence. "Under such circumstances, our review is generally limited to determining whether there was 'a manifest miscarriage of justice.'" *United States v. Hernandez*, 227 F.3d 686, 694 (6th Cir. 2000)(quoting *United States v. Abdullah*, 162 F.3d 897, 903 (6th Cir. 1998)). "A 'miscarriage of justice' exists only if the record is 'devoid of evidence pointing to guilt.' " *Abdullah*, 162 F.3d at 903(quoting *United States v. Price*, 134 F.3d 340, 350 (6th Cir.), *cert. denied,* 525 U.S. 845(1998)).

The legal questions to be decided in relation to the first two arguments are: Does wire fraud require a defendant-specific material misrepresentation? Does a conviction for receipt of converted government property and money laundering require facts that would support a conviction for wire fraud or other fraudulent taking?

Our analysis begins with the United States Supreme Court's statement in *Neder v. United States*, 527 U.S. 1, 20 (1999):

> We also granted certiorari in this case to decide whether materiality is an element of a "scheme or artifice to defraud" under the federal mail fraud (18 U.S.C. § 1341), wire fraud (§ 1343), and bank fraud (§ 1344) statutes.

Although the mail fraud and wire fraud statutes contain different jurisdictional elements, the Supreme Court confirmed that the fraud statutes prohibit "any scheme or artifice to defraud" or to obtain money or property "by means of false or fraudulent pretenses, representations, or promises." *Id.* At the time the statute was passed, the well-settled meaning of "fraud" required a misrepresentation or concealment of material fact. *Neder,* 527 U.S. at 22. In *Durland v. United States*, 161 U.S. 306 (1896), its first decision construing the mail fraud statute, the Supreme Court

9

construed the statute to "includ[e] everything designed to defraud by representations as to the past or present, or suggestions and promises as to the future." *Neder,* 527 U.S. at 24(quoting *Durland*, 161 U.S. at 313). Accordingly, the Court held that materiality of falsehood is an element of the federal mail fraud, wire fraud, and bank fraud statutes. *Neder*, 527 U.S. at 25.

In general, a false statement "is material if it has 'a natural tendency to influence , or [is] capable of influencing, the decision of the decision-making body to which it was addressed.'" *Id.* at 16 (quoting *United States v. Gaudin*, 515 U.S. 506, 509 (1995)). The misrepresentation or omission must have the purpose of inducing the victim of the fraud to part with property or undertake some action that he would not otherwise do absent the misrepresentation or omission. *United States v. Daniel,* 329 F.3d 480, 487 (6th Cir. 2003).

Mail fraud cases may be used to analyze wire fraud cases. *Daniel,* 329 F.3d at 486 n.1. In *United States v. Frost,* 125 F.3d 346, 354 (6th Cir. 1997), this court stated that a defendant can commit mail fraud even if he personally did not use the mails. *Frost,* 125 F.3d at 354. The conviction requires only a showing that the defendant acted with knowledge that use of the mails would follow in the ordinary course of business or that a reasonable person would have anticipated the use of the mails. A defendant does not commit mail fraud unless he possesses the specific intent to deceive or defraud. *Frost*, 125 F.3d at 354.

In support of their first argument, defendants correctly quote the statement by this court that "as an element of the 'scheme or artifice to defraud' requirement, the government must prove that the Defendant said something materially false."*Daniel*, 329 F.3d at 486 (citing *Neder v. United States*, 527 U.S. 1 (1999)). *Daniel* was a single-defendant case, as was the case cited therein, *United States v. DeSantis*, 134 F.3d 760, 764 (6th Cir.1998)*.* Since the issue of multiple defendants was not

10

before the courts in those cases, each referred to a single defendant when discussing issues of materiality and misrepresentation. The Supreme Court in *Neder* did not require a defendant-specific misrepresentation, however, but only that a material misrepresentation was part of the scheme.

The elements of wire fraud are set forth in the 2005 edition of the Sixth Circuit Pattern Jury Instructions, Section 10.02:

> For you to find the defendant guilty of wire fraud, you must find the government has proved each and every one of the following elements beyond a reasonable doubt:
> (A) First, that the defendant [knowingly participated in][devised][intended to devise] a scheme [to defraud][to obtain money or property by false or fraudulent pretenses, representations or promises];
> (B) Second, that the scheme included a material misrepresentation or concealment of material fact;
> ( C) Third, that the defendant had the intent to defraud; and
> (D) Fourth, that the defendant [used wire, radio, or television][caused another to use wire, radio or television communications] in interstate [foreign] commerce in furtherance of the scheme.

In the Committee Commentary to Instruction 10.02, it is stated:

> To define the elements of wire fraud, the Committee relied primarily on *Neder v. United States*, 527 U.S. 1 (1999); *United States v. Gold Unlimited, Inc.* 177 F.3d 472 (6th Cir.1999) and *United States v. Frost*, 125 F.3d 346 (6th Cir.1997). In the context of wire fraud, the Sixth Circuit identified the elements in *United States v. Smith*, 39 F.3d 119, 122 (6th Cir.1994) and *United States v. Ames Sintering Company*, 927 F.2d 232, 234 (6th Cir. 1990).

In *Frost,* this court analyzed a multi-defendant scheme where professors with access to a data system provided information to students who did not access the system, but played other parts in the scheme. We found that the students did participate in the scheme to defraud because "[t]he inescapable conclusion is that [the students] intended for [the professors] to breach the trust which the University had placed in [the professors]. *Frost*, 125 F.3d at 369. As in this case, where the defendants intended

11

for Hanson to breach the trust HUD had placed in him, the insider making material misrepresentations was necessary for the success of the scheme. In *Frost*, the students signed their name to plagiarized papers. In our case, the Birnies signed illegitimate, often blank or only partially-completed, contracts.

In *United States v. Crossley*, 224 F.3d 847 (6th Cir. 2000), the two defendants were approached by an insider, an insurance adjuster, in a strategy that involved filing false claims in the name of false clients and then sharing the profits after the false client cashed the insurance check. Their only involvement was to give the insider their names and mailing addresses and then to cash the checks. The indictment charged a conspiracy and a mail fraud count. In analyzing the sufficiency of the evidence presented on the mail fraud count, this court found that a rational juror examining the evidence presented at trial could have concluded that a defendant knowingly participated in a scheme to defraud when it would have been obvious to her that she was not entitled to money. *Crossley,* 224 F.3d at 857. Unlike the case before us, the defendant in *Crossley* was not even aware of the substance of the material misrepresentations or the general outline of the conspiracy.

We therefore disagree with defendants' argument that an element of the crime is that each defendant must have made a material misrepresentation. We find that the evidence need only show that each defendant participated in a scheme to defraud that involved a misrepresentation of material fact.

We also disagree with the defendants' argument regarding the factual insufficiency of the evidence against them. They argue that only Hanson made material misrepresentations and that no material misrepresentation specifically attributable to them was proven at trial.

12

A misrepresentation can be made through omissions or through circumstances "reasonably calculated to deceive persons of ordinary prudence and comprehension". *United States v. Hathaway*, 798 F.2d 902, 908 (6th Cir.1986). Deception is not necessarily confined to a direct misstatement of fact. *United States v. Lichota*, 351 F.2d 81, 91 (6th Cir.1965).

The Birnies did make material misrepresentations. John Birnie signed blank or incomplete purchase agreements. Emalee Birnie acted as a closing agent in transactions where she knew the purchase price was fraudulent. Immediately after purchasing each property, defendants insured the property for a much higher amount, close to the property's true value and then, shortly thereafter, resold the property on land contract at a substantial profit.

The defendants suggest that it is analytically meaningful that Appellant has not been charged with conspiracy to perpetuate a fraud against the United States. The United States Court of Appeals for the Seventh Circuit has addressed this issue in a case cited favorably by the Committee developing the jury instructions for the Sixth Circuit. In *United States v. Wilson*, 506 F.2d 1252, 1257 (7th Cir.1974):

> It is not essential that the indictment contain a separate count charging conspiracy in order to take advantage of the doctrines peculiar to conspiracy. *United States v. Joyce*, 499 F.2d 9, 16 (7th Cir. 1974). In a prosecution for mail fraud, once agreement to a scheme has been adequately established, any party to the agreement is responsible for the acts and declarations of another party in furtherance of the common scheme, whether or not he knew of or agreed to any specific mailing. *United States v. Joyce*, *supra*.

There is sufficient evidence on the record before us to conclude that no miscarriage of justice occurred in this case. There is ample evidence to indicate that defendants knowingly participated in a scheme to defraud HUD, that the scheme involved misrepresentations of material fact, that they intended to defraud, and that wire communications were used. Having agreed to the scheme, defendants could foresee the necessary input of fraudulent entries into SAMS and other misrepresentations made in furtherance of the scheme.

Because the outcome of the Birnies' wire fraud charges does not control the completely independent elements of conversion and money laundering, the Birnies' argument that the validity of their convictions for receipt of converted government property and money laundering are legally contingent upon the wire fraud convictions also fails.

Receipt of converted government property requires that a defendant receive stolen government property with intent to convert and knowledge that it was stolen. *United States v. Stuart*, 22 F.3d 76, 80 (3ʳᵈ Cir. 1994). Money laundering requires that a defendant knowingly engaged in a pecuniary transaction within the United States, knowing that the transaction involved criminally derived property, and that the property was worth more than $10,000 and was in fact derived unlawfully. *United States v. Ables*, 167 F.3d 1021, 1028-29 (6ᵗʰ Cir.), *cert. denied,* 527 U.S. 1027 (1999) .

A rational juror could find beyond a reasonable doubt that both Birnies knew they were involved in a scheme to defraud which required material misrepresentations and that they, in fact, made material misrepresentations. The crimes charged in the other counts are independent of those crimes; the elements are not the same. Defendants do not dispute that there was sufficient evidence for them to be found guilty of the charges of converting government property and money laundering. Therefore, we hold that the district court did not err in denying their Motions for Acquittal.

14

**B.  JURY INSTRUCTION**

Defendants argue that the district court erred in rejecting their request for a jury instruction on the element of "material misrepresentation" as to the alleged fraudulent scheme. The Judge gave the following jury instruction:

> Now, Counts I through 10 of the indictment accuse both the defendant John and EmaLee Birnie of wire fraud in violation of federal law.  It is a federal crime or offense for anyone to use interstate wire communication facilities in carrying out a scheme to defraud.  The defendants can be found guilty of that offense only if all the following facts are proven beyond a reasonable doubt:
> First, that the defendant knowingly devised or participated in a scheme to defraud, or for obtaining money or property by means of false pretenses, representations, or promises.
> Second, that the false pretenses, representations or promises related to a material fact.
> Third, that the defendants did so willfully and with the intent to defraud.
> And fourthly, that the defendants transmitted or caused to be transmitted by wire in interstate commerce some communication for the purpose of executing the scheme to defraud.

In considering the correctness and adequacy of a charge to the jury, it should be taken as a whole and read in its entirety. *Nolan v. Green*, 383 F.2d 814, 816 (6th Cir. 1967).  This court reviews a district court's refusal to give a proposed jury instruction for abuse of discretion. *Williams ex rel. Hart v. Paint Valley Local School Dist*, 400 F.3d 360, 366 (6th Cir. 2005).  "A district court's refusal to deliver a requested instruction is reversible error only if the instruction  (1) is a correct statement of the law, (2) is not substantially covered by the charge actually delivered to the jury, and (3) concerns a point so important in the trial that the failure to give it substantially impairs the defendant's defense." *DeSantis*, 134 F.3d at 768 (citing *United States v. Williams*, 952 F.2d 1504, 1512 (6th Cir. 1991)).

15

As determined in the previous discussion, the district court's instruction on wire fraud correctly stated the elements of the crime. There is no requirement that each defendant make a material misrepresentation. The Birnies' requested instruction was unnecessary, and it incorrectly applied language from *Daniel* to a scheme to defraud involving multiple defendants. Therefore, the court did not abuse its discretion in rejecting the proposed instruction.

## C. SENTENCING

The defendants share sentencing issues all addressed to enhancements to the base offense level based on judicially found facts neither admitted by the defendant nor found by a jury. The disputed enhancements are a 2-level enhancement pursuant to U.S.S.G. § 3C1.1 for obstruction of justice; a 2-level enhancement for "more than minimal planning"; a 9-level enhancement to John Birnie's sentencing range based on a finding that the intended loss was $378,900.00; and 11 levels to Emalee Birnie's sentencing range based on a finding that her intended loss was $621,800.00. Finally, they argue it was presumptively unreasonable to sentence them to alternative sentences.

Defendants contend that their sentences violate the Sixth Amendment in light of the Supreme Court's decision in *United States v. Booker*, 543 U.S. 220 (2005), and ask that their sentences be vacated. The United States agrees that remand is necessary for the limited purpose of determining a sentence under the advisory guidelines. In view of *Booker*, we conclude we must vacate their sentences and remand the cases to the district court for resentencing.

We need not address the specific claims of sentencing error now given that the district court must reconsider the appellants' sentences in their totality upon remand. *United States v. Davis*, 430 F.3d 345, 362 (6th Cir. 2005). If, after resentencing, the defendants still believe their sentences to be erroneous they may challenge their sentences on appeal. *Id.*

16

## III. CONCLUSION

We **VACATE** the sentences and **REMAND** for re-sentencing in light of this opinion and the Supreme Court's opinion in *Booker*. As to the other issues raised by defendants, we **AFFIRM** the district court's judgment.